# IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

| | |
|---|---|
| JABARI LYLES<br>2200 MT. ROYAL TERRACE, #6<br>BALTIMORE, MD 21217<br><br>*on his own behalf and on behalf of*<br>*all others similarly situated,*<br><br>Plaintiffs,<br>v.<br><br>CHEGG, INC.<br>3990 FREEDOM CIRCLE<br>SANTA CLARA, CA 95054<br><br>Serve on:<br>The Corporation Trust, Inc.<br>2405 York Road, Suite 201<br>Timonium, MD 21093<br><br>Defendant | **JURY TRIAL DEMANDED**<br><br>24·C·19·004768<br><br>Case: 24-C-19-004768<br>CV File New<br>$60.00<br>CASE NO. _____ Appear Fee<br>$10.00<br>NIF-New Case<br>$30.00<br>FILE<br>$55.00<br>TOTAL $175.00<br><br>Receipt #2019002017&<br>Cashier: CU CCBCA&Z<br>09/11/19  1:09PM |

## CLASS ACTION COMPLAINT

Plaintiff Jabari Lyles ("Named Plaintiff"), on his own behalf and on behalf of all others

similarly situated, through his attorneys, Cory L. Zajdel, Esq., David M. Trojanowski, Esq., and

Jeffrey C. Toppe, Esq., hereby submits this Class Action Complaint against Defendant Chegg,

Inc. ("Chegg"), and for support states as follows:

Case: 24-C-19-004768
Appear Fee
$10.00
TOTAL $10.00

### I. PRELIMINARY STATEMENT

1. Chegg, Inc. (hereinafter "Chegg" or "Defendant") is a direct-to-student online

learning platform that provides educational materials and services to high school and college

students.

Receipt #2019002017&
Cashier: CU CCBCA&Z

i

2.     In 2018, over 5.4 million students bought or rented a textbook through Chegg, and over 3.1 million students subscribed to Chegg's interactive online learning services.

3.     On September 25, 2018, Chegg reported that an unauthorized party had gained access on or around April 29, 2018 to approximately 40 million users' data ("Affected Individuals"), including usernames, email addresses, shipping addresses, and hashed Chegg passwords.

4.     Named Plaintiff, both individually and on behalf of those similarly situated persons (hereafter "Class Members"), brings this Class Action to secure redress against Chegg for their reckless and negligent violations of customer privacy rights (the "Chegg Data Breach"). Affected Individuals are current and former customers who entrusted Chegg with their personally identifiable information ("PII"), including email addresses, shipping addresses, and passwords.

5.     Affected Individuals suffered injury. As a result of Chegg's wrongful actions and inactions, Affected Individuals' PII was stolen. Affected Individuals who used Chegg's services have had their PII compromised, their privacy rights violated, and have been exposed to the risk of fraud and identity theft.

## II.    JURISDICTION

6.     This Court has jurisdiction over this case under MD. CODE ANN., CTS. & JUD. PROC. § 1-501.

7.     This Court has personal jurisdiction over Defendant Chegg pursuant to MD. CODE ANN., CTS. & JUD. PROC. § 6-103(1)-(5), as Chegg systematically and continually transacts business in Maryland, the case arises out of a transaction that took place within Maryland, and CAC contracts to supply goods or services in Maryland.

2

8.      Venue is appropriate because, among other things: (a) Plaintiff is a resident of Baltimore City and a citizen of Maryland; (b) Defendant had directed its activities at residents in Baltimore City; and (c) Defendant conducts a large amount of its business in Baltimore City.

## III.   PARTIES

9.      Named Plaintiff is a natural person currently residing at 2200 Mt. Royal Terrace, #6, Baltimore, MD 21217.

10.     Defendant Chegg is incorporated under the laws of Delaware with its principal office located at 3990 Freedom Circle, Santa Clara, California 95054.

## IV.    FACTUAL ALLEGATIONS

### A.    *The Chegg Data Breach*

11.     On September 25, 2018, Chegg filed a Form 8-K with the SEC, stating in relevant part:

> On September 19, 2018, Chegg learned that on or around April 29, 2018, an unauthorized party gained access to a Company database that hosts user data for chegg.com and certain of the Company's family of brands such as EasyBib. The Company understands that the information that may have been obtained could include a Chegg user's name, email address, shipping address, Chegg username, and hashed Chegg password. The investigation into the incident, which is supported by third-party forensics, is ongoing. To date, the Company understands that no social security numbers or financial information such as users' credit card numbers or bank account information were obtained. The Company expects to start notifying approximately 40 million active and inactive registered users and certain regulatory authorities on September 26, 2018.

12.     Chegg's database collects personal information of its users including the user's name, email address, school, gender, age, birthdate, zip code and other demographic information. Additionally, Chegg's database collects payment information in the form of credit card numbers for users who choose to purchase products or services on the Chegg website.

3

13.     Affected Individuals paid substantial premiums for Chegg services and trusted Chegg with their sensitive data.

14.     Chegg was aware and recognized that Affected Individuals rely on Chegg to properly safeguard their PII.

15.     Chegg has not disclosed more details about the Chegg Data Breach.

16.     Named Plaintiff did not receive a notification from Chegg regarding the Chegg Data Breach.

17.     Upon information and belief, Chegg did not notify the approximately 40 million active and inactive registered users about the Chegg Data Breach.

18.     Since the Chegg Data Breach, Named Plaintiff has received scam calls which mention his PII.

B.     *Stolen Information is Valuable to Hackers and Thieves*

19.     It is well known, and the subject of many media reports, that PII is highly coveted and a frequent target of hackers. Affected Individuals PII Affected Individuals.

20.     Despite well-publicized litigation and frequent public announcements of data breaches, Chegg opted to maintain an insufficient and inadequate system to protect the PII of Named Affected Individuals.

21.     Chegg negligently and recklessly put Named Plaintiff's and Class Members' PII at risk and the PII, on information and belief, was actually stolen.

22.     Legitimate organizations and criminal underground alike recognize the value of PII. Otherwise, they would not aggressively seek or pay for it.

23.     As previously seen in one of the world's largest breaches, hackers compromised the card holder data of 40 million customers. *See* "Target: 40 million credit cards compromised," CNN     l     Money,     Dec.     19,     2013,     *available*     at

4

http://money.cnn.com/2013/12/18/news/companies/target-credit-card/ (last visited Apr. 9, 2019).

24.     Credit or debit card information is highly valuable to hackers. Credit and debit card information that is stolen from the point of sale are known as "dumps." *See* Krebs on Security April 16, 2016, Blog Post, *available at*     https://krebsonsecurity.com/2016/04/all-about-fraud-how-crooks-get-the-cvv/ (last visited Apr. 9, 2019).

25.     Credit and debit card dumps can be sold in the cybercrime underground for a retail value of about "\$20 apiece." *Id.*

26.     This information can also be used to clone a debit or credit card. *Id.*

### C.     *The Chegg Data Breach Has and Will Result in Additional Identity Theft/Fraud*

27.     Chegg failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the data breach.

28.     Among its security failures was the fact that Chegg stored its users' passwords as unsalted, MD5[1] hashes.

29.     As early as 1996, merely five years after MD5's creation, cryptographers discovered flaws with the design of MD5. In 2004, several additional flaws were discovered with MD5 that made further use of the algorithm for security purposes questionable. For instance, there are tables—known as "Rainbow Tables—that provide a compilation of common passwords, listed in hashed form.[2] This tool enables hackers to "look up" hashed passwords as if they were searching

---

[1] MD5 is an algorithm used by cryptographers to protect stored digital information, including stored passwords.
[2] For example, the password "password123" is converted to "482c811da5d5b4bc6d497ffa98491c38" when stored as an MD5 hash. A hacker would simply need to search for this string of characters in a Rainbow Table in order to decipher the password as being "password123." This is problematic, since there is a finite number of non-random passwords, since people typically choose passwords that are easy for them to remember (for example, a person might use their mother's name followed by a single-digit number as their password).

for the definition of a word in the dictionary. If the Rainbow Table contains the hashed password, then the hacker will know what the password is. As of 2010, MD5 was considered by some to be "cryptographically broken and unsuitable for further use."[3]

30.     The basic step of "salting" the stored passwords would have made the stored passwords exceptionally more secure (*e.g.* harder to crack in the event of a breach), and Chegg did not take that basic step. Salts are used to safeguard passwords that are in storage. A password in storage may be "salted" or "unsalted." If a user's password is "salted," it simply means that extra random characters are assigned to that user's password, in order to make it harder for a hacker to reveal the hashed password. Since salts do not have to be memorized by humans, they can make the size of the hash table required for a successful attack prohibitively large without placing a burden on the users. In other words, salting passwords makes it much harder for a hacker to reveal the user's password in the event of a hack. In this case, users' passwords were stored in such a manner so as to make cracking the stored passwords exceptionally easy.[4]

31.     However, on information and belief, as of the date of the Chegg Data Breach, Chegg was still storing its users' passwords as unsalted, MD5 hashes, despite the fact that this was known to be an insecure method of storing passwords.

32.     The ramification of Chegg's failure to keep Affected Individuals' data secure is severe. For instance, on information and belief, the database stolen in the Chegg Data Breach is for sale on the black market. This is especially troubling since people tend to use the same

---

[3] *See* https://en.wikipedia.org/wiki/MD5#Overview_of_security_issues (last accessed September 9, 2019).

[4] Since people tend to use the same username/password combination across multiple platforms (*i.e.* a user might have one username/password combination for multiple different websites), the cracking of Chegg's passwords was especially harmful to their users.

username/password combination across multiple platforms (*i.e.* a user might have one username/password combination for multiple different websites). So whoever acquires this database will likely have access to millions of username/password combinations that may be used on websites *other than* Chegg's.

33.     Security flaws and other infirmities were explicitly outlined by Visa, as early as 2009, when it issued a Data Security Alert outlining the threat of RAM scraper malware. The report instructs companies to "[s]ecure remote access connectivity," "[i]mplement a secure network configuration, including egress and ingress filtering to only allow the ports/services necessary to conduct business" (*i.e.*, segregate networks), "actively monitor logs of network components, including IDS [intrusion detection systems] and firewalls for suspicious traffic, particularly outbound traffic to unknown addresses," "[e]ncrypt cardholder data anywhere it is being stored and [] implement[] a data field encryption solution to directly address cardholder data in transit" and "[w]ork with your payment application vendor to ensure security controls are in place to prevent unauthorized modification to the payment application configuration."

34.     All merchants that accept customer payments via payment cards, including Uber, are obligated and required to comply with the Payment Card Industry Data Security Standards (the "PCI DSS"). *Maintaining Payment Security, Payment Card Industry Security Standards, available at:* https://www.pcisecuritystandards.org/pci_security/maintaining_payment_security (last visited Apr. 9, 2019) (stating "[i]f you accept or process payment cards, the PCI Data Security Standards apply to you.").

35.     Compliance with the PCI DSS is common practice in the retail industry. The PCI DSS, among other things, mandates merchants to protect cardholder data, PCI DSS v. 3.0 at 34 (Nov. 2013), requires merchants to install and maintain firewalls, *id.* at 19, forbids merchants from

·7

using default settings and passwords for applications and devices, *id.* at 28, requires merchants to segment cardholder data, *id.* at 61, and requires merchants to identify and authenticate their system users. *Id.* at 64.

36. Additionally, sub-requirement 3.2 of the PCI DSS requires merchants and other organizations involved in payment card transactions to refrain from storing sensitive authentication data after authorization (even if it is encrypted). *See id.* at 35. To adhere to the PCI DSS, a merchant must, *inter alia*:

> First, **Assess** -- identify cardholder data, take an inventory of your IT assets and business processes for payment card processing, and analyze them for vulnerabilities that could expose cardholder data. Second, **Remediate** -- fix vulnerabilities and do not store cardholder data unless you need it. Third, **Report** -- compile and submit required remediation validation records (if applicable), and submit compliance reports to the acquiring bank and card brands you do business with.

*How to Be Compliant: Getting Started with PCI Data Security Standard Compliance*, PCISSC, *available at* https://www.pcisecuritystandards.org/merchants/how_to_be_compliant.php (last visited April 9, 2019) (emphasis in original).

37. According to Javelin Strategy and Research, "one in every three people who is notified of being a potential fraud victim becomes one . . . with 46% of consumers who had cards breached becoming fraud victims that same year." "Someone Became an Identity Theft Victim Every 2 Seconds Last Year," Fox Business, Feb. 5, 2014 *available* at http://www.foxbusiness.com/personal-finance/2014/02/05/someone-became-identitytheft-victim-every-2-seconds-last-year.html.

38. It is incorrect to assume that reimbursing a consumer for a financial loss due to fraud makes that individual whole again.

39. On the contrary, after conducting a study, the Department of Justice's Bureau of

8

Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems." *See* "Victims of Identity Theft," U.S. Department of Justice, Dec 2013, *available at* https://www.bjs.gov/content/pub/pdf/vit12.pdf. In fact, the BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims." *Id.* at 11.

**D.** *Annual Monetary Losses From Identity Theft Are in the Billions of Dollars*

40. Javelin Strategy and Research reports that those losses increased to $21 billion in 2013. *See* 2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters, *available* at: https://www.javelinstrategy.com/coverage-area/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters. There may be a time lag between when harm occurs and when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.
>
> As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

GAO, Report to Congressional Requesters, at 33 (June 2007), *available* at http://www.gao.gov/new.items/d07737.pdf.

41. Affected Individuals now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights.

42. Affected Individuals are incurring and will continue to incur such damages in addition to any fraudulent credit and debit card charges incurred by them and the resulting loss of use of their credit and access to funds, whether or not such charges are ultimately reimbursed by

9

the credit card companies.

E.    *Affected Individuals Suffered Damages*

43.    The Chegg Data Breach was a direct and proximate result of Chegg's failure to properly safeguard and protect Affected Individuals' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including Chegg's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Affected Individuals' PII to protect against reasonably foreseeable threats to the security or integrity of such information.

44.    Affected Individuals' PII is private and sensitive in nature and was inadequately protected by Chegg.

45.    Chegg did not obtain Affected Individuals' consent to disclose their PII, except to certain persons not relevant to this action, as required by applicable law and industry standards.

46.    As a direct and proximate result of Chegg's wrongful action and inaction and the resulting Chegg Data Breach, Affected Individuals have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time and effort to mitigate the actual and potential impact of the subject data breach on their lives by, among other things, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring their credit reports and accounts for unauthorized activity.

47.    As a result of the Chegg Data Breach, Affected Individuals' debit cards and credit cards were exposed and subjected to unauthorized charges; their bank accounts were overdrawn and credit limits exceeded; they were deprived of the use of their cards and access to their funds; their preauthorized charge relationships were disrupted; they were required to expend time, energy and expense to address and resolve these financial disruptions and mitigate

the consequences; and they suffered consequent emotional distress and their credit and debit card information is at an increased risk of theft and unauthorized use.

48.     Affected Individuals were deprived of the use of their credit and debit cards for appreciable periods of time and were unable to access their accounts or their funds; lost accumulated miles and points toward bonus awards and were unable to earn points during the interval their cards were inactivated; were required to pay fees to issuing banks for replacement cards; were required to cancel and change their registered numbers with online sellers; were required to change the pre-authorizations; were placed in non-payment status by virtue of their cards being overdrawn or abruptly cancelled and were required to pay penalties and service reinstatement fees; purchased identity theft insurance and credit monitoring services to protect themselves against possible consequences of the breach; suffered emotional distress as they were forced to cope with the unauthorized charges and other consequences of the Chegg Data Breach and were still not aware of the Chegg Data Breach or that their PII was compromised.

49.     Some Affected Individuals did not cancel their debit and credit cards and continue to experience fraudulent activity on their accounts.

50.     Chegg's wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Affected Individuals' PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a.     Theft of their PII, including, on information and belief, actual theft of credit/debit card numbers;

b.     The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals and already misused

11

via the sale of Affected Individuals' information on the Internet black market;

    c.    The untimely and inadequate notification of the Chegg Data Breach;

    d.    The improper disclosure of Affected Individuals' PII;

    e.    Loss of privacy;

    f.    Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach;

    g.    Ascertainable losses in the form of deprivation of the value of their PII, for which there is a well-established national and international market;

    h.    Overpayments to Chegg for credit reporting services during the subject data breach in that a portion of the price paid for such use by Affected Individuals to Chegg was for the costs of reasonable and adequate safeguards and security measures that would protect customers' PII, which Chegg and its affiliates did not implement and, as a result, Affected Individuals did not receive what they paid for and were overcharged by Chegg; and

    i.    Deprivation of rights under the Unfair Competition Laws.

## V.   CLASS ACTION ALLEGATIONS

51.    Named Plaintiff brings this action on his own behalf and pursuant to the FEDERAL RULES OF CIVIL PROCEDURE 23(b)(2) and (b)(3).

52.    Named Plaintiff brings this action on behalf of a Nationwide Class consisting of:

> **All persons residing in the United States, including the District of Columbia, whose PII was disclosed in the Chegg Data Breach.**

53.    Excluded from the Class are those individuals: (a) who now are or have ever been executives of the Defendant and the spouses, parents, siblings, and children of all such individuals.

54.    The Class, as defined above, is identifiable. Named Plaintiff is a member of the Class.

55.     The Class consists, at a minimum, of forty (40) individuals and is thus so numerous that joinder of all members is clearly impracticable.

56.     There are questions of law and fact which are not only common to the Class but which predominate over any questions affecting only individual Class Members.

57.     The common and predominating questions include, but are not limited to:

a)  Whether Chegg owed a duty of care to Affected Individuals with respect to the security of their personal information;

b)  Whether Chegg took reasonable steps and measures to safeguard Affected Individuals' PII;

c)  Whether Chegg violated common and statutory law by failing to promptly notify Affected Individuals that their PII was compromised;

d)  Whether Chegg has an implied contractual obligation to use reasonable security measures;

e)  Whether Chegg complied with any implied contractual obligation to use reasonable security measures;

f)  Whether Chegg's acts and omissions described herein give rise to a claim of negligence;

g)  Whether Chegg knew or should have known of the security breach prior to its September 2018 disclosure;

h)  Whether Chegg had a duty to promptly notify Affected Individuals that their PII was, or potentially could be, compromised;

i)  Whether Chegg promptly notified Affected Individuals that their PII was, or potentially could be, compromised;

j) What security measures, if any, must be implemented by Chegg to comply with its implied contractual obligations;

k) Whether Affected Individuals are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

58.     Claims of Named Plaintiff are typical of the claims of the respective members of the Class and are based on and arise out of similar facts constituting the wrongful conduct of Chegg.

59.     Named Plaintiff will fairly and adequately protect the interests of the Class.

60.     Named Plaintiff is committed to vigorously litigating this matter.

61.     Further, Named Plaintiff has secured counsel experienced in handling consumer class actions and complex consumer litigation.

62.     Neither Named Plaintiff, nor their counsel, have any interests which might cause them not to vigorously pursue this claim.

63.     The likelihood that individual members of the Class will prosecute separate actions in court is remote due to the time and expense necessary to conduct such litigation.

64.     Counsel for Named Plaintiff and the Class are experienced in class actions and foresee little difficulty in the management of this case as a class action.

## VI.    CAUSES OF ACTION

### COUNT ONE
### BREACH OF IMPLIED CONTRACT
#### (On behalf of the Nationwide Class)

65.     Named Plaintiff incorporates by reference all of the allegations herein as if each and every allegation is set forth fully herein.

66.     Chegg solicited and invited Affected Individuals to create accounts and use Chegg's online services.

14

67.     Affected Individuals accepted Chegg's offers by creating Chegg accounts and using Chegg's online services.

68.     When Affected Individuals created accounts and used Chegg's online services, they provided their PII.

69.     In so doing, Affected Individuals entered into implied contracts with Chegg to which Chegg agreed to safeguard and protect such information and to timely and accurately notify Affected Individuals if their data had been breached and compromised.

70.     Affected Individuals would not have provided and entrusted their PII to Chegg in the absence of the implied contract between them and Chegg.

71.     Affected Individuals fully performed obligations under the implied contracts with Chegg.

72.     Chegg breached the implied contract it made with Affected Individuals by failing to safeguard and protect the PII of Affected Individuals and by failing to provide timely and accurate notice that their PII was compromised as a result of the Chegg Data Breach.

73.     As a direct and proximate result of Chegg's breaches of the implied contracts between Chegg and Affected Individuals, Affected Individuals sustained actual losses and damages as described in detail above.

## COUNT TWO
## NEGLIGENCE
### (On behalf of the Nationwide Class)

74.     Named Plaintiff re-alleges and incorporates by reference the allegations set forth herein, and further alleges:

75.     A special relationship exists between Chegg and Affected Individuals.

76.     Chegg actively solicited Affected Individuals to create accounts and use their PII in sales transactions on Chegg's website.

15

77.     When Affected Individuals gave their PII to Chegg to create an account and/or facilitate and close sales transactions, they did so with the mutual understanding that C h e g g had reasonable security measures in place and Chegg would take reasonable steps to protect and safeguard the PII of Affected Individuals. Affected Individuals also gave their PII to Chegg on the premise that Chegg was in a superior position to protect against the unauthorized access, theft and misuse of that information.

78.     Upon accepting Affected individuals' PII in their system, Chegg undertook and owed a duty to Affected Individuals to exercise reasonable care to secure and safeguard that information from being compromised, lost, stolen, misused, and or/disclosed to unauthorized parties, and to utilize commercially reasonable methods to do so. This duty included, among other things, designing, maintaining, and testing Chegg's security systems to ensure that Affected Individuals' PII was adequately secured and protected.

79.     Chegg further had a duty to implement processes that would detect a breach of its security system in a timely manner.

80.     Chegg had a duty to timely disclose to Affected Individuals that their PII had been or was reasonably believed to have been compromised. Timely disclosure was appropriate so that, among other things, Affected Individuals could take appropriate measures to avoid use of bank funds, and monitor their account information and credit reports for fraudulent activity.

81.     Chegg breached its duty to discover and to notify Affected Individuals of the unauthorized access by failing to discover the security breach within reasonable time and by failing to notify Affected Individuals of the breach timely.

16

82. To date, Chegg has not provided sufficient information to Affected Individuals regarding the extent and scope of the unauthorized access and continues to breach its disclosure obligations to Affected Individuals.

83. Chegg also breached its duty to Affected Individuals to adequately protect and safeguard this information by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured PII.

84. Furthering its negligent practices, Chegg failed to provide adequate supervision and oversight of the PII with which it is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted a third party to gather Affected Individuals' PII, misuse the PII, and intentionally disclose it to others without consent.

85. Through Chegg's acts and omissions described in this Complaint, including Chegg's failure to provide adequate security and its failure to protect Affected Individuals' PII from being foreseeably captured, accessed, disseminated, stolen, and misused, Chegg unlawfully breached its duty to use reasonable care to adequately protect and secure Affected Individuals' PII during the time it was within Chegg's control.

86. Further, through its failure to timely discover and provide clear notification of the Chegg Data Breach to consumers, Chegg prevented Affected Individuals from taking meaningful, proactive steps to secure their PII.

87. Upon information and belief, Chegg improperly and inadequately safeguarded the PII of Affected Individuals in deviation from standard industry rules, regulations, and practices at the time of the data breach.

17

88.     Chegg's failure to take proper security measures to protect Affected Individuals' sensitive PII as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Affected Individuals' PII.

89.     Chegg's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to: failing to adequately protect the PII; failing to conduct adequate regular security audits; failing to provide adequate and appropriate supervision of persons having access to Affected Individuals' PII.

90.     Affected Individuals did not contribute to the Chegg Data Breach and subsequent misuse of their PII as described in this Complaint.

91.     As a direct and proximate result of Chegg's negligence, Affected Individuals sustained actual losses and damages as described in detail above.

## COUNT THREE
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (On behalf of the Nationwide Class)

92.     Named Plaintiff re-alleges and incorporates by reference the allegations set forth herein, and further alleges:

93.     The law implies a covenant of good faith and fair dealing in every contract.

94.     Affected Individuals contracted with Chegg by accepting Chegg's offers and paying for Chegg's online services.

95.     Affected Individuals performed all of the significant duties under their agreements with Chegg.

96.     The conditions required for Chegg's performance under the contract has occurred.

97.     Chegg did not provide and/or unfairly interfered with and/or frustrated the right of Affected Individuals to receive the full benefits under their agreement.

98.    Chegg breached the covenant of good faith and fair dealing implied in its contracts with Affected Individuals by failing to use and provide reasonable and industry-leading security practices.

99.    Affected Individuals were damaged by Chegg's breach in that they paid for, but never received, the valuable security protections to which they were entitled, and which would have made their products and services more valuable.

## COUNT FOUR
## VIOLATION OF CALIFORNIA CIVIL CODE § 1798.80 *et. seq*
### (On behalf of the Nationwide Class)

100.    Named Plaintiff re-alleges and incorporates by reference the allegations set forth herein, and further alleges:

101.    Chegg owns, licenses and/or maintains computerized data that includes Affected Individuals' PII.

102.    Chegg was required to, but failed, to take all reasonable steps to dispose, or arrange for the disposal, of records within its custody or control containing PII when the records were no longer to be retained, by shredding, erasing, or otherwise modifying the personal information in those records to make it unreadable or undecipherable through any means.

103.    Chegg was required to, but failed, to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Chegg Data Breach.

104.    The Chegg Data Breach constituted a "breach of the security system" within the meaning of section 1798.82(g) of the California Civil Code.

105.    The information compromised in the Chegg Data Breach constituted "personal information" within the meaning of section 1798.80(e) of the California Civil Code.

106.    California Civil Code § 1798.82(a) requires disclosure of data breaches "in the most expedient time possible and without unreasonable delay[.]"

107.    Chegg violated Cal. Civ. Code § 1798.82(a) by unreasonably delaying disclosure of the Chegg Data Breach to Affected Individuals whose PII was, or was reasonably believed to have been, acquired by an unauthorized person.

108.    Upon information and belief, no law enforcement agency instructed Chegg that notification to Affected Individuals would impede a criminal investigation.

109.    As a result of Chegg's violation of Cal. Civ. Code § 1798.80, *et seq.*, Affected Individuals incurred economic damages, including expenses associated with monitoring their personal and financial information to prevent further fraud.

110.    Named Plaintiff, individually and on behalf of the Class, seeks all remedies available under Cal. Civ. Code § 1798.84, including, but not limited to: (a) actual damages suffered by Affected Individuals; (b) statutory damages for Chegg's willful, intentional, and/or reckless violations ; (c) equitable relief; and (d) reasonable attorneys' fees and costs.

111.    Because Chegg was guilty of oppression, fraud or malice, in that it failed to act with a willful and conscious disregard of Affected Individuals' rights, Named Plaintiff also seeks punitive damages.

## COUNT FIVE
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE § 17200 UNLAWFUL BUSINESS PRACTICE
### (On behalf of the Nationwide Class)

112.    Named Plaintiff re-alleges and incorporate by reference the allegations set forth herein, and further alleges:

113.    Chegg engaged in unlawful, unfair or fraudulent business acts and practices and unfair, deceptive, untrue or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code §17200.

114.    Chegg engaged in unlawful acts and practices with respect to its services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Affected Individuals' PII with knowledge that the information would not be adequately protected; and by gathering Affected Individuals' PII in an unsecure electronic environment in violation of California's data breach statute, Cal. Civ. Code § 1798.81.5, which requires Chegg to take reasonable methods of safeguarding Affected Individuals' PII.

115.    In addition, Chegg engaged in unlawful acts and practices with respect to its services by failing to discover and then disclose the Chegg Data Breach to Affected Individuals in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82.

116.    To date, Chegg has still not provided such sufficient information to Affected Individuals.

117.    As a direct and proximate result of Chegg's unlawful acts and practices, Affected Individuals were injured and lost money or property, including but not limited to the loss of their legally protected interest in the confidentiality and privacy of their PII. and additional losses described above.

118.    Chegg knew or should have known that its system had been breached and data security practices were inadequate to safeguard Affected Individuals' PII and that the risk of a data breach or theft was highly likely.

21

119.    Chegg's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to Affected Individuals' rights.

120.    Affected Individuals seek relief under Cal. Bus. & Prof. Code § 17200, *et. seq.*, including, but not limited to, restitution to Affected Individuals of money or property that Chegg may have acquired by means of its unlawful, and unfair business practices, restitutionary disgorgement of all profits accruing to Uber because of its unlawful and unfair business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and injunctive or other equitable relief.

## COUNT SIX
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE § 17200 UNLAWFUL BUSINESS PRACTICE
### (On behalf of the Nationwide Class)

121.    Named Plaintiff re-alleges and incorporates by reference the allegations set forth herein, and further allege:

122.    Chegg engaged in unfair acts and practices by soliciting and collecting Affected Individuals' PII with knowledge that the information would not be adequately protected; while Affected Individuals' PII would be processed in an unsecure electronic environment.

123.    These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Affected Individuals.

124.    The unfair acts and practices were likely to deceive the public into believing their PII was secure, when it was not.

125.    The harm these practices caused to Affected Individuals outweighed their utility, if any.

22

126.     Chegg engaged in unfair acts and practices with respect to the provision of its services by failing to enact adequate privacy and security measures and protect Affected Individuals' PII from further unauthorized disclosure, release, data breaches, and theft, and failing to timely discovery and give notice of the Chegg Data Breach.

127.     As a direct and proximate result of Chegg's unfair practices and acts, Affected Individuals were injured and lost money or property, including but not limited to the loss of their legally protected interest in the confidentiality and privacy of their PII, and additional losses described above.

128.     Chegg knew or should have known that its systems and data security practices were inadequate to safeguard Affected Individuals' PII and that the risk of a data breach or theft was highly likely.

129.     Chegg's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to Affected Individuals' rights.

## COUNT SEVEN
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE 17200 FRAUDULENT/DECEPTIVE BUSINESS PRACTICES
### (On behalf of the Nationwide Class)

130.     Named Plaintiff re-alleges and incorporates by reference the allegations set forth herein, and further alleges:

131.     Chegg engaged in fraudulent and deceptive acts and practices by representing and advertising that it would maintain adequate data privacy and security practices and procedures to safeguard the Affected Individuals' PII from unauthorized disclosure, release, data breaches, and theft; and representing and advertising that it did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the members of Affected

23

Individuals' PII. These representations were likely to deceive members of the public, including Affected Individuals, into believing their PII was securely stored, when it was not, and that Chegg was complying with relevant law, when it was not.

132. Chegg engaged in fraudulent and deceptive acts and practices by omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for Affected Individuals' PII. At the time that Affected Individuals were creating accounts and using Chegg's online services, Chegg failed to disclose to Affected Individuals that its data security systems failed to meet legal and industry standards for the protection of their PII.

133. Affected Individuals would not have created accounts with Chegg or used Chegg's online services if they had known about its substandard data security practices.

134. These representations were likely to deceive members of the public, including Affected Individuals, into believing their PII was secure, when it was not, and that Chegg was complying with relevant law and industry standards, when it was not.

135. As a direct and proximate result of Chegg's deceptive practices and acts, Affected Individuals were injured and lost money or property, including but not limited to the loss of their legally protected interest in the confidentiality and privacy of their PII, and additional losses described above.

136. Chegg knew or should have known that its system and data security practices were inadequate to safeguard Affected Individuals' PII and that the risk of a data breach or theft was highly likely.

137. Chegg's actions in engaging in the abovenamed unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to Affected Individuals' rights.

138.    Affected Individuals seek relief under Cal. Bus. & Prof. Code § 17200, *et. seq.*, including, but not limited to, restitution to Affected Individuals of money or property that Chegg may have acquired by means of its fraudulent and deceptive business practices, restitutionary disgorgement of all profits accruing to Chegg because of its fraudulent and deceptive business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

## COUNT EIGHT
## CONSTITUIONAL INVASION OF PRIVACY
### (On behalf of the Nationwide Class)

139.    Named Plaintiff re-alleges and incorporates by reference the allegations set forth herein, and further alleges:

140.    Cal. Const., Art. I., section 1 provides that "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

141.    Affected Individuals had a legally protected privacy interest in the PII provided to Chegg.

142.    Affected Individuals had a reasonable expectation of privacy as to the PII they provided to Chegg under the circumstances of their purchases.

143.    Chegg's actions and inactions amounted to a serious invasion of Affected Individuals' protected privacy interests.

144.    Chegg's invasion of Affected Individuals' reasonable expectation of privacy caused Affected Individuals to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, Named Plaintiff, individually and on behalf of all Affected Individuals,

respectfully requests that this Court:

      A.  Assume jurisdiction of this case;

      B.  Enter an order certifying the Nationwide Class under MD. RULE 2-231(b)(2) and

         (b)(3);

      C.  Enter an order awarding actual and compensatory damages, in an amount to be

         determined;

      D.  Enter an order awarding costs of suit and attorneys' fees, as allowable by law;

      E.  Enter an order awarding punitive damages, in an amount to be determined; and

      F.  Such other and further relief as this court may deem just and proper.

Respectfully submitted,

Z LAW, LLC

Dated: September 10, 2019

Cory L. Zajdel (CPF #0412150442)
David M. Trojanowski (CPF #1412180233)
Jeffrey C. Toppe (CPF #1412180230)
2345 York Road, Ste. B-13
Timonium, MD 21093
(443) 213-1977
clz@zlawmaryland.com
dmt@zlawmaryland.com
jct@zlawmaryland.com

**Attorneys for Plaintiffs**

## DEMAND FOR JURY TRIAL

Named Plaintiff requests a jury trial for any and all Counts for which a trial by jury is

permitted by law.

_____
Cory L. Zajdel

IN THE CIRCUIT COURT FOR Baltimore City
(City or County)

## CIVIL - NON-DOMESTIC CASE INFORMATION REPORT

### DIRECTIONS

*Plaintiff:* This Information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Judge of the Court of Appeals pursuant to Rule 2-111(a).

*Defendant:* You must file an Information Report as required by Rule 2-323(h).

*THIS INFORMATION REPORT CANNOT BE ACCEPTED AS A PLEADING*

FORM FILED BY: ☒PLAINTIFF  ☐DEFENDANT    CASE NUMBER _____ (Clerk to insert)

CASE NAME: Jabari Lyles, et al.                    vs. Chegg, Inc.
                    Plaintiff                              Defendant

PARTY'S NAME: Jabari Lyles                                  PHONE: _____

PARTY'S ADDRESS: 2200 Mt. Royal Terrace, #6, Baltimore, MD 21217

PARTY'S E-MAIL: _____

If represented by an attorney:
PARTY'S ATTORNEY'S NAME: Cory L. Zajdel          PHONE: 443-213-1977

PARTY'S ATTORNEY'S ADDRESS: Z Law, LLC, 2345 York Road, #B-13, Timonium, MD 21093

PARTY'S ATTORNEY'S E-MAIL: CLZ@ZLAWMARYLAND.COM

JURY DEMAND? ☒Yes ☐No

RELATED CASE PENDING? ☐Yes ☒No If yes, Case #(s), if known: _____

ANTICIPATED LENGTH OF TRIAL?: _____ hours __5__ days

### PLEADING TYPE

New Case: ☒Original      ☐Administrative Appeal    ☐Appeal
Existing Case: ☐Post-Judgment    ☐Amendment
*If filing in an existing case, skip Case Category/ Subcategory section - go to Relief section.*

### IF NEW CASE: CASE CATEGORY/SUBCATEGORY (Check one box.)

**TORTS**
- ☐ Asbestos
- ☐ Assault and Battery
- ☐ Business and Commercial
- ☐ Conspiracy
- ☐ Conversion
- ☐ Defamation
- ☐ False Arrest/Imprisonment
- ☐ Fraud
- ☐ Lead Paint - DOB of Youngest Plt: _____
- ☐ Loss of Consortium
- ☐ Malicious Prosecution
- ☐ Malpractice-Medical
- ☐ Malpractice-Professional
- ☐ Misrepresentation
- ☐ Motor Tort
- ☐ Negligence
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability
- ☐ Specific Performance
- ☐ Toxic Tort
- ☐ Trespass
- ☐ Wrongful Death

**CONTRACT**
- ☐ Asbestos
- ☒ Breach
- ☐ Business and Commercial
- ☐ Confessed Judgment
  (Cont'd)
- ☐ Construction
- ☐ Debt
- ☐ Fraud

**Government**
- ☐ Government
- ☐ Insurance
- ☐ Product Liability

**PROPERTY**
- ☐ Adverse Possession
- ☐ Breach of Lease
- ☐ Detinue
- ☐ Distress/Distrain
- ☐ Ejectment
- ☐ Forcible Entry/Detainer
- ☐ Foreclosure
  - ☐ Commercial
  - ☐ Residential
  - ☐ Currency or Vehicle
  - ☐ Deed of Trust
  - ☐ Land Installments
  - ☐ Lien
  - ☐ Mortgage
  - ☐ Right of Redemption
  - ☐ Statement Condo
- ☐ Forfeiture of Property / Personal Item
- ☐ Fraudulent Conveyance
- ☐ Landlord-Tenant
- ☐ Lis Pendens
- ☐ Mechanic's Lien
- ☐ Ownership
- ☐ Partition/Sale in Lieu
- ☐ Quiet Title
- ☐ Rent Escrow
- ☐ Return of Seized Property
- ☐ Right of Redemption
- ☐ Tenant Holding Over

**PUBLIC LAW**
- ☐ Attorney Grievance
- ☐ Bond Forfeiture Remission
- ☐ Civil Rights
- ☐ County/Mncpl Code/Ord
- ☐ Election Law
- ☐ Eminent Domain/Condemn.
- ☐ Environment
- ☐ Error Coram Nobis
- ☐ Habeas Corpus
- ☐ Mandamus
- ☐ Prisoner Rights
- ☐ Public Info. Act Records
- ☐ Quarantine/Isolation
- ☐ Writ of Certiorari

**EMPLOYMENT**
- ☐ ADA
- ☐ Conspiracy
- ☐ EEO/HR
- ☐ FLSA
- ☐ FMLA
- ☐ Workers' Compensation
- ☐ Wrongful Termination

**INDEPENDENT PROCEEDINGS**
- ☐ Assumption of Jurisdiction
- ☐ Authorized Sale
- ☐ Attorney Appointment
- ☐ Body Attachment Issuance
- ☐ Commission Issuance

- ☐ Constructive Trust
- ☐ Contempt
- ☐ Deposition Notice
- ☐ Dist Ct Mtn Appeal
- ☐ Financial
- ☐ Grand Jury/Petit Jury
- ☐ Miscellaneous
- ☐ Perpetuate Testimony/Evidence
- ☐ Prod. of Documents Req.
- ☐ Receivership
- ☐ Sentence Transfer
- ☐ Set Aside Deed
- ☐ Special Adm. - Atty
- ☐ Subpoena Issue/Quash
- ☐ Trust Established
- ☐ Trustee Substitution/Removal
- ☐ Witness Appearance-Compel

**PEACE ORDER**
- ☐ Peace Order

**EQUITY**
- ☐ Declaratory Judgment
- ☐ Equitable Relief
- ☐ Injunctive Relief
- ☐ Mandamus

**OTHER**
- ☐ Accounting
- ☐ Friendly Suit
- ☐ Grantor in Possession
- ☐ Maryland Insurance Administration
- ☐ Miscellaneous
- ☐ Specific Transaction
- ☐ Structured Settlements

CC-DCM-002 (Rev. 04/2017)              Page 1 of 3

## IF NEW OR EXISTING CASE: RELIEF (Check All that Apply)

- ☐ Abatement
- ☐ Administrative Action
- ☐ Appointment of Receiver
- ☐ Arbitration
- ☐ Asset Determination
- ☐ Attachment b/f Judgment
- ☐ Cease & Desist Order
- ☐ Condemn Bldg
- ☐ Contempt
- ☐ Court Costs/Fees
- ☒ Damages-Compensatory
- ☒ Damages-Punitive

- ☐ Earnings Withholding
- ☐ Enrollment
- ☐ Expungement
- ☒ Findings of Fact
- ☐ Foreclosure
- ☐ Injunction
- ☐ Judgment-Affidavit
- ☐ Judgment-Attorney Fees
- ☐ Judgment-Confessed
- ☐ Judgment-Consent
- ☐ Judgment-Declaratory
- ☐ Judgment-Default

- ☒ Judgment-Interest
- ☐ Judgment-Summary
- ☒ Liability
- ☐ Oral Examination
- ☐ Order
- ☐ Ownership of Property
- ☐ Partition of Property
- ☐ Peace Order
- ☐ Possession
- ☐ Production of Records
- ☐ Quarantine/Isolation Order
- ☐ Reinstatement of Employment

- ☐ Return of Property
- ☐ Sale of Property
- ☐ Specific Performance
- ☐ Writ-Error Coram Nobis
- ☐ Writ-Execution
- ☐ Writ-Garnish Property
- ☐ Writ-Garnish Wages
- ☐ Writ-Habeas Corpus
- ☐ Writ-Mandamus
- ☐ Writ-Possession

*If you indicated Liability above,* mark one of the following. This information is *not* an admission and may not be used for any purpose other than Track Assignment.

☐Liability is conceded. ☐Liability is not conceded, but is not seriously in dispute. ☒Liability is seriously in dispute.

## MONETARY DAMAGES (Do not include Attorney's Fees, Interest, or Court Costs)

- ☐ Under $10,000
- ☐ $10,000 - $30,000
- ☐ $30,000 - $100,000
- ☒ Over $100,000

☐ Medical Bills $_____   ☐ Wage Loss $_____   ☐ Property Damages $_____

## ALTERNATIVE DISPUTE RESOLUTION INFORMATION

Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)

A. Mediation  ☐Yes  ☒No          C. Settlement Conference  ☐Yes  ☒No
B. Arbitration  ☐Yes  ☒No          D. Neutral Evaluation  ☐Yes  ☒No

## SPECIAL REQUIREMENTS

☐ If a Spoken Language Interpreter is needed, check here and attach form CC-DC-041

☐ If you require an accommodation for a disability under the Americans with Disabilities Act, check here and attach form CC-DC-049

## ESTIMATED LENGTH OF TRIAL

*With the exception of Baltimore County and Baltimore City, please fill in the estimated LENGTH OF TRIAL.*          *(Case will be tracked accordingly)*

☐ 1/2 day of trial or less          ☐ 3 days of trial time

☐ 1 day of trial time          ☐ More than 3 days of trial time

☐ 2 days of trial time

## BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM

*For all jurisdictions, if Business and Technology track designation under Md. Rule 16-308 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ Expedited- Trial within 7 months of          ☐ Standard - Trial within 18 months of
   Defendant's response                             Defendant's response

## EMERGENCY RELIEF REQUESTED

## COMPLEX SCIENCE AND/OR TECHNOLOGICAL CASE
## MANAGEMENT PROGRAM (ASTAR)

*FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO ASTAR RESOURCES JUDGES under Md. Rule 16-302, attach a duplicate copy of complaint and check whether assignment to an ASTAR is requested.*

☐ **Expedited** - Trial within 7 months of
Defendant's response

☐ **Standard** - Trial within 18 months of
Defendant's response

*IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY, OR BALTIMORE COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.*

### CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

| | | |
|---|---|---|
| ☐ | Expedited | Trial 60 to 120 days from notice. Non-jury matters. |
| ☐ | Civil-Short | Trial 210 days from first answer. |
| ☐ | Civil-Standard | Trial 360 days from first answer. |
| ☒ | Custom | Scheduling order entered by individual judge. |
| ☐ | Asbestos | Special scheduling order. |
| ☐ | Lead Paint | Fill in: Birth Date of youngest plaintiff........................ . |
| ☐ | Tax Sale Foreclosures | Special scheduling order. |
| ☐ | Mortgage Foreclosures | No scheduling order. |

### CIRCUIT COURT FOR BALTIMORE COUNTY

| | | |
|---|---|---|
| ☐ | Expedited (Trial Date-90 days) | Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus. |
| ☐ | Standard (Trial Date-240 days) | Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases. |
| ☐ | Extended Standard (Trial Date-345 days) | Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency. |
| ☐ | Complex (Trial Date-450 days) | Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases. |

September 10, 2019
_____
Date

Z Law, LLC, 2345 York Road, Suite #B-13
_____
Address

Timonium          MD          21093
_____
City          State          Zip Code

_____
Signature of Counsel / Party

Cory L. Zajdel
_____
Printed Name

CC-DCM-002 (Rev. 04/2017)          Page 3 of 3

# Z LAW

**CORY L. ZAJDEL, ESQ.**

(443) 213-1977
CLZ@ZLAWMARYLAND.COM

## CONSUMER PROTECTION LAW FIRM

September 10, 2019

**BY US MAIL**

Clerk of the Court-Civil
Courthouse East
Circuit Court of Maryland for Baltimore City
111 N. Calvert Street, Room 462
Baltimore, Maryland 21202

> Re: **Civil-Non-Domestic-Case Information Report, Class Action Complaint, Check for $175.00 and Service Copy**
> *Jabari Lyles, et al. v. Chegg, Inc.*

Dear Clerk:

Kindly file the enclosed Original Class Action Complaint. Please also find enclosed a Civil-Non-Domestic-Case Information Report and a check for $175.00 to cover the filing fees. Two copies of each, other than the check, are enclosed to be returned to me with a Summons for service on Credit Acceptance Corp. through its resident agent.

Sincerely,

Cory L. Zajdel, Esq.

CLZ

Enclosures