IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

|  |  |  |
|---|---|---|
| JABARI LYLES, on his own behalf and on behalf of all others similarly situated, | ) ) ) | Case No. 1:19-cv-3235 |
| Plaintiff, | ) ) ) | Hon. Richard D. Bennett |
| v. | ) ) | |
| CHEGG, INC., | ) ) | |
| Defendant. | ) ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CHEGG, INC.'S MOTION FOR CLARIFICATION OR MODIFICATION OF THE COURT'S APRIL 27, 2020 ORDER**

**Table of Contents**

Page

I.      INTRODUCTION ................................................................................................ 1

II.     FACTS ................................................................................................................. 5

        A.      The Court Grants Chegg's Motion to Compel Arbitration and Orders the
                Parties to Proceed to Arbitration.................................................................. 5

        B.      Z Law Purportedly Files 15,107 Separate Demands for Arbitration .................... 5

        C.      Lyles's Counsel Embarks on a Course of Conduct Designed to Maximize
                Chegg's Costs .............................................................................................. 6

        D.      The Boxes Were Missing Demands................................................................ 10

        E.      Many of the Demands in the Boxes Were Improperly Filed .............................. 10

                1.      Many Initial Claimants Never Agreed to the Terms of Use ................... 10

                2.      Some Initial Claimants Were Not Chegg Users, While Others
                        Were Not Chegg Users Prior to the Event ............................................. 11

        F.      All of the Demands in the Boxes Were Identical to One Another and
                Claimed Exactly $25,000 in Damages to Defeat Small-Claims-Court
                Jurisdiction .................................................................................................. 11

        G.      The $25,000 Damages Claim Lacked a Factual Foundation .............................. 12

        H.      The $25,000 Damages Claim Also Lacked a Legal Foundation ........................ 14

                1.      The $25,000 Damages Claims Are Contradicted by Case Law............... 14

                2.      The Limitation of Liability Provision Prohibits Recovery Beyond
                        $250.................................................................................................. 15

                3.      All Damages Sought Are Barred by the Consequential Damages
                        Disclaimer ........................................................................................ 15

        I.      The AAA Charges Chegg $7,553,500 in Filing Fees for the Initial
                Demands ...................................................................................................... 16

        J.      Chegg Notifies the Initial Claimants of Their Material Breaches and
                Exercises Its Legal Rights by Reason of Such Material Breaches ...................... 17

        K.      Z Law Purportedly Files 1,007 More Separate Demands for Arbitration
                Based on the Event, Including One of Behalf of Lyles ...................................... 18

        L.      The Subsequent Claimants (Including Lyles), Together with the AAA,
                Carry Out the Exact Same Playbook with Regard to the Subsequent
                Demands as They Did Regarding the Initial Demands........................................ 18

        M.      Chegg Notifies the Subsequent Claimants (Including Lyles) of Their
                Material Breaches and Exercises Its Legal  Rights by Reason of Such
                Material Breaches ......................................................................................... 19

Page

III.   ARGUMENT ................................................................................................ 20

A.   Clarification of the Court's Order, Confirming That Chegg Need Not
Proceed to Arbitration Now That the Arbitration Provision Is
Unenforceable, Is Appropriate ............................................................... 20

a.   Lyles Breached the Terms of Use's Implied Covenant of
Good Faith and Fair Dealing .......................................... 21

b.   Lyles's Breaches Were Material ................................................... 24

c.   Because of Lyles's Material Breaches, Chegg Was
Relieved of Any Further Obligations Under the Terms of
Use, Including Its Arbitration Provision ..................................... 26

d.   The Delegation Clause Is No Longer Enforceable Against
Chegg by Lyles for the Same Reasons ........................................ 27

e.   In any Event, Chegg's Performance is Excused due to
Impracticability and Frustration ................................................... 28

B.   In the Alternative, Modification of the Order, Relieving Chegg of Any
Obligation to Arbitrate, Is Appropriate ................................................. 30

1.   Legal Standard .................................................................................. 30

2.   The Motion Is Timely ...................................................................... 31

3.   Chegg Has a Meritorious Position ................................................... 31

4.   Granting this Motion Would Not Cause Unfair Prejudice .............. 31

5.   Extraordinary Circumstances Are Present ....................................... 32

IV.   CONCLUSION ............................................................................................ 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkins v. Facebook*,
424 F. Supp. 3d 686 (N.D. Cal. 2019) ...................................................................14

*Advanced Thermal Sciences Corp. v. Applied Materials, Inc.*,
No. SACV 07–1384 JVS (JWJx), 2010 WL 2015236 (C.D. Cal. May 18,
2010) .......................................................................................................................16

*Atl. Mortg. & Inv. Corp. v. Stephenson*,
86 Conn. App. 126 (2004) ......................................................................................22

*Badie v. Bank of Am.*,
67 Cal. App. 4th 779 (1st Dist. 1998) ...............................................................21, 24

*Best Buy Stores, L.P. v. Manteca Lifestyle Ctr., LLC*,
859 F. Supp. 2d 1138 (E.D. Cal. 2012)...................................................................22

*Brown v. Grimes*,
192 Cal. App. 4th 265 (2011) .................................................................................26

*Brunner v. Lyft, Inc.*,
No. 19-CV-04808-VC, 2019 WL 6001945 (N.D. Cal. Nov. 14, 2019) ..................27

*Buck v. Davis*,
137 S. Ct. 759 (2017).............................................................................................32

*Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*,
2 Cal. 4th 342 (1992) .........................................................................................21, 24

*Cobb v. Ironwood Country Club*,
233 Cal. App. 4th 960 (2015) .................................................................................22

*Cohn v. Taco Bell Corp.*,
No. 92 C 5852, 1995 WL 247996 (N.D. Ill. Apr. 24, 1995)...................................21

*Eliasieh v. Legally Mine*,
2020 WL 1929244 (N.D. Cal. April 21, 2020)..................................................26, 27

*Foley v. Interactive Data Corp.*,
47 Cal. 3d 654 (1988) ............................................................................................21

*Ford Motor Co. v. Edgewood Properties, Inc.*,
No. CIV.A. 06-1278, 2008 WL 4559770 (D.N.J. Oct. 8, 2008)............................22

*Guidiville Rancheria of California v. United States*,
  704 F. App'x 655 (9th Cir. 2017)....................................................................................22, 24

*Habitat Tr. for Wildlife, Inc. v. City of Rancho Cucamonga*,
  175 Cal. App. 4th 1306 (2009) .....................................................................................29

*Ladd v. Warner Bros. Entm't, Inc.*,
  184 Cal. App. 4th 1298 (Cal. Ct. App. 2010) ......................................................................21

*Liljeberg v. Health Servs. Acquisitions Corp.*,
  486 U.S. 847 (1988)..............................................................................................30, 32, 33

*Nat'l Credit Union Admin. Bd. v. Gray*,
  1 F.3d 262 (4th Cir. 1993) ..........................................................................................30, 31, 32

*Nielsen Contracting, Inc. v. Applied Underwriters, Inc.*,
  22 Cal. App. 5th 1096 (2018) .....................................................................................28

*P.E.A. Films, Inc. v. Metro-Goldwyn-Mayer, Inc.*,
  No. CV1409010BROGJSX, 2016 WL 6818758 (C.D. Cal. Aug. 10, 2016) ........................24

*Rivera v. Uniqlo Cal., LLC*,
  2017 WL 6539016 (C.D. Cal. Sept. 8, 2017) ..........................................................................28

*Sackett v. Spindler*,
  248 Cal. App. 2d 220 (1967) ...................................................................................25

*Simon v. San Paolo U.S. Holding Co.*,
  35 Cal. 4th 1159 (2005) ....................................................................................16

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
  996 F. Supp. 2d 942 (S.D. Cal. 2014), *order corrected*, No. 11MD2258 AJB
  (MDD), 2014 WL 12603117 (S.D. Cal. Feb. 10, 2014) ..........................................................14

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003).................................................................................................16

*Syndicate Films Int'l, LLC v. All. Films, Inc.*,
  No. CV 09-3873 PA (CTX), 2010 WL 11519582 (C.D. Cal. Feb. 2, 2010) ...........................24

*Thrifty Payless, Inc. v. The Americana at Brand, LLC*,
  218 Cal. App. 4th 1230 (2013) ....................................................................................22

*Tiri v. Lucky Chances, Inc.*,
  226 Cal. App. 4th 231 (2014) ..................................................................................27, 28

*In re Under Armour Sec. Litig.*,
  No. CV RDB-17-0388, 2020 WL 363411 (D. Md. Jan. 22, 2020)....................................30, 31

**Statutes**

9 U.S.C. § 2..............................................................................................................27

Cal. Civ. Code § 1598................................................................................................29

Cal. Code Civ. P. § 116.221......................................................................................12

Cal. Code Civ. P. § 1284.3(b)(1) ..............................................................................9

Cal. Code Civ. P. § 1281.2(b)...................................................................................27

Fed. R. Civ. P. 11(b) .................................................................................................6

Fed. R. Civ. P. 60(b)(6)...................................................................................4, 30, 33

**Other Authorities**

1 Witkin, Summary 11th Contracts § 854 (2020)......................................................29

Alison Frankel, *Mass consumer arbitration is on! Ed tech company hit with
   15,000 data breach claims*, REUTERS (May 12, 2020),
   https://www.reuters.com/article/legal-us-otc-chegg/mass-consumer-
   arbitration-is-on-ed-tech-company-hit-with-15000-data-breach-claims-
   idUSKBN22O33E...................................................................................................6

Black's Law Dictionary (9th ed. 2009).......................................................................16

R.Rep. No. 96, 68th Cong., 1st Sess., 1 (1924) ........................................................24

Restatement (Second) of Contracts § 205...................................................................21

Restatement (Second) of Contracts § 237 (1981).................................................25, 26

Restatement (Second) of Contracts § 261 (1981).......................................................29

SUETHEM.COM https://www.suethem.com/ (last visited Jul. 29, 2020)...............13, 33

*TERMS OF USE*, SUETHEM.COM https://suethem.com/Home/TermsOfUse (last
   visited Jul. 29, 2020).......................................................................................9, 13

Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 877 .............................25

*Zynga Lawsuit Questionnaire*, SUETHEM.COM
   https://www.suethem.com/Company?companyId=12 (last visited Jul. 29,
   2020) ...................................................................................................................13

Chegg, Inc. ("Chegg") hereby submits this memorandum in support of its Motion for Clarification or Modification ("Motion") of this Court's April 27, 2020 Order (ECF No. 25) granting Chegg's motion to compel arbitration of Plaintiff Jabari Lyles's ("Lyles") claims against Chegg stemming from the data security incident Chegg announced in September 2018 (the "Order").

## I.    <u>INTRODUCTION</u>

The Motion, while unusual, has unfortunately been necessitated by Lyles's improper conduct subsequent to this Court's issuance of the Order. As Chegg argued in seeking the Order, the agreement between Lyles and Chegg called for them to arbitrate his claims arising out of the cyberattack that Chegg suffered. Chegg moved this Court to enforce that agreement, and the Court did so. Rather than proceed to arbitrate his claims in accordance with the agreed arbitration provision, however, Lyles, through his counsel, breached that provision by embarking on a campaign deliberately calculated to force Chegg to incur, ***wholly needlessly***, more than ***fifty million dollars in arbitration fees alone*** through the arbitration process.

Here is how Lyles did that. Through his counsel, Lyles banded together with no fewer than 16,113 other claimants to pursue against Chegg arbitration claims stemming from the cyberattack. All 16,114 claims of Lyles and his fellow claimants are word-for-word identical to one another. Under the parties' arbitration agreement and the applicable American Arbitration Association ("AAA") rules, Lyles and his fellow claimants could have asserted their cyberattack-related claims by causing their counsel to file a single arbitration demand with the AAA that asserted all of their identical claims; had they done that, the AAA filing, administrative, and arbitrator fees associated with their claims would likely have been no more than $3,400. Instead of pursuing that sensible and available approach, however, Lyles and his fellow claimants caused their counsel to bring their claims before the AAA by means of filing 16,114 identical, ***but***

*separate*, arbitration demands with the AAA – resulting in the AAA filing, administrative, and arbitrator fees associated with their claims ballooning from merely $3,400 to a jaw-dropping *$54,000,000 plus*. Thereafter, when Chegg pointed out to Lyles and his fellow claimants the $54 million fee savings that could be achieved by re-filing their claims with the AAA by means of a single demand instead of separate demands, they summarily and without explanation rejected Chegg's suggestion.

Now why would Lyles and his fellow claimants pursue arbitration in this seemingly financially insane manner? The reason is obvious. Under the parties' arbitration agreement, *Chegg* bears the initial cost of the overwhelming majority (indeed, according to Lyles and his fellow claimants, all) of any applicable AAA fees. Moreover, even if at the end of the day the arbitrator were to order Lyles and each of his fellow claimants to reimburse Chegg for whatever AAA fees Chegg fronted as to his or her demand, Chegg would have to pursue 16,114 separate $3,400 collection actions all around the country to enforce that aspect of the arbitrator's award, which would be economically impractical. In other words, if the arbitration process employed by Lyles and his fellow claimants were to go forward as they intend, Chegg would be saddled with up to $54 million in unrecoverable arbitration fees merely as the price of admission to that process. Plainly, then, Lyles and his fellow claimants' objective in pursuing this arbitration approach was and is not to have their claims arbitrated on the merits, but rather to make their claims so prohibitively expensive to arbitrate that Chegg simply could not afford to do so.

This point is made clear by reviewing the demands Lyles and his fellow claimants filed with the AAA. In their demands, Lyles and his fellow claimants incredibly claim that *each and every one of them* is entitled to exactly *$25,000* in damages from the cyberattack, for a total of *$402,850,000*. They each make this damages claim without having, much less offering, a shred

of a basis in fact for claiming such amount, and they each did so even in the face of provisions in the parties' agreement that exclude liability for indirect, economic, special, incidental, or consequential damages and that in any event limit Chegg's liability to $250. The $25,000 damages claim made by each of Lyles and his fellow claimants is therefore patently frivolous.

Now why would Lyles and each of his fellow claimants each frivolously claim $25,000 in damages in his or her AAA arbitration demand? Again, the reason is obvious. Under the parties' arbitration agreement, once an arbitration is commenced under that agreement, either party has the right to litigate the claims in question in small claims court if they fall within small-claims-court jurisdiction. This provision only makes sense, as it prevents one party from forcing arbitration on another party where the amount at issue is too small for the claim to be worth arbitrating, given the arbitration fees that would be involved. Here, then, there was a potentially fatal flaw in Lyles and his fellow claimants' plan to pursue arbitration via a process that would unnecessarily impose on Chegg more than $50 million in arbitration fees: since none of them could possibly have a valid claim for more than $250, Chegg could defeat the plan by choosing to litigate their claims in small claims court. So, in order to block Chegg from availing itself of the small-claims-court option, Lyles and his fellow claimants made sure to keep their claims outside of small-claims-court jurisdiction by each including in his or her demand a fictitious $25,000 damages claim.

So why is Chegg back before this Court on the present motion? As explained below, Lyles and his fellow claimants, by each filing, through his or her counsel, a frivolous arbitration demand for the improper purpose of imposing onerous and unnecessary arbitration costs on Chegg, materially breached the arbitration agreement and, to the extent severable, also the clause in that agreement delegating matters of arbitrability to the arbitrator. Specifically, implied in

-3-

each of these agreements, as in every agreement, is a covenant of good faith and fair dealing. The arbitration demands filed by Lyles and his fellow claimants through their counsel breached that covenant by reason of their improper purpose and their frivolous damages claims; these breaches constituted material breaches of the parties' agreements, the arbitration provisions therein, and, to the extent severable, the delegation clauses in those provisions. Under California law, these material breaches relieved Chegg from any further obligation to perform under each agreement and accordingly excused Chegg from any contractual obligation it previously had to arbitrate the cyberattack-related claims of Lyles and his fellow claimants and/or to comply with the delegation clause. In addition, these material breaches entitled Chegg to terminate each agreement. Chegg accordingly notified Lyles and his fellow claimants, through their counsel, of the material breaches in question and of Chegg's election to exercise its right to cease all performance under, and of its separate right to terminate, each of the agreements. As matters now stand, then, Chegg no longer has a contractual obligation to arbitrate Lyles's cyberattack-related claims or to comply with the Lyles-Chegg agreement's delegation clause.

By its terms, the Order provides that "[t]he parties will proceed to arbitration." Chegg does not believe this term of the Order requires Chegg to arbitrate Lyles's cyberattack-related claims even though Chegg is no longer under an enforceable contractual obligation to do so. In an abundance of caution, and out of respect for the Court's process, however, Chegg respectfully seeks a clarification to this effect of this provision of the Order. In the alternative, Chegg requests modification of this term of the Order, pursuant to Fed. R. Civ. P. 60(b)(6), confirming that the Order no longer requires Chegg to proceed to arbitration, based on Lyles's subsequent material breaches of the arbitration provision and Chegg's subsequent exercise of its right, by reason of such material breaches, to cease performance under that provision.

-4-

## II.   FACTS

### A.   The Court Grants Chegg's Motion to Compel Arbitration and Orders the Parties to Proceed to Arbitration

Lyles filed a putative class action complaint based on an event that occurred on or around April 29, 2018, in which an unauthorized party allegedly gained access to a database containing Chegg user data (the "Event").  Class Action Complaint, ECF No. 1-2 ("Compl.") ¶¶ 3, 11.  The information that may have been obtained during the Event could include a Chegg user's name, email address, shipping address, Chegg username, and hashed Chegg password.  *Id*. ¶¶ 3, 11; Form 8-K, ECF No. 21-5.

Lyles had created a Chegg account on September 30, 2014 and agreed to the Chegg terms of use in effect at that time.  Order at 2.  Lyles's only alleged injury resulting from the Event was that he "received scam calls which mention his PII."  Compl. ¶ 18. He makes this claim even though he does not allege, because he cannot allege, that his phone number was in any way compromised in the Event, or even that he ever provided his phone number to Chegg.  *See id.* He does not claim that these "scam calls" resulted in any tangible injury, nor does he allege that anyone committed identity fraud in his name as a result of the Event.  *See id.*

On December 4, 2019, Chegg filed a motion to compel arbitration and dismiss Lyles's complaint.  ECF No. 21.  On April 27, 2020, this Court granted Chegg's motion and ordered, "The parties will proceed to arbitration."  Order at 8.

### B.   Z Law Purportedly Files 15,107 Separate Demands for Arbitration

On April 30, 2020, Lyles's counsel Z Law purportedly filed 15,107 separate demands for arbitration ("initial demands") with the American Arbitration Association ("AAA") based on the Event, on behalf of 15,107 individuals ("initial claimants")[1] that Z Law purports to represent.

---

[1] Lyles was not among the initial claimants.

*See* Meal Decl., Ex. 2.  Z Law purportedly delivered the initial demands to Chegg in six boxes

(*see* Meal Decl., ¶ 5) that, according to Z Law, weighed over two hundred pounds.[2]

Z Law included in the six boxes a cover letter that enclosed the arbitration agreement

purportedly governing the initial claimants' disputes – the Chegg terms of use last updated

February 19, 2019 ("Terms of Use").  *See* Meal Decl., Ex. 3.  According to Z Law, the Terms of

Use required Chegg to pay "all filing and other fees" for the initial claimants' demands because

each demand sought less than $75,000 (*see* Meal Decl., Ex. 2), in apparent reliance on the

following Terms of Use provision:

> Your responsibility to pay any AAA filing, administrative and arbitrator fees will
> be solely as set forth in the AAA Rules.  However, if your claim for damages does
> not exceed $75,000, Chegg will pay all such fees unless the arbitrator finds that
> either the substance of your claim or the relief sought in your Demand for
> Arbitration was frivolous or was brought for an improper purpose (as measured
> by the standards set forth in Federal Rule of Civil Procedure 11(b)).

Meal Decl., Ex. 3.

### C.    Lyles's Counsel Embarks on a Course of Conduct Designed to Maximize Chegg's Costs

Given the volume of the initial demands, Z Law provided the AAA a spreadsheet of the

claimant data and electronic versions of the demands.  Meal Decl. ¶ 7.  But Z Law specifically

instructed the AAA to not provide these materials to Chegg.  *Id.*  When Chegg requested these

materials, Z Law refused.  Meal Decl. ¶¶ 7-8.  Chegg instead was forced to retain a vendor to

pick up the boxes, scan each demand contained therein, and extract the information from each

such demand one demand at a time.  Tehada Decl. ¶ 2, Meal Decl., ¶ 9.  The process of

reviewing the contents of the six boxes thus was made more costly than otherwise would have

---

[2] Alison Frankel, *Mass consumer arbitration is on! Ed tech company hit with 15,000 data breach claims*, REUTERS (May 12, 2020), https://www.reuters.com/article/legal-us-otc-chegg/mass-consumer-arbitration-is-on-ed-tech-company-hit-with-15000-data-breach-claims-idUSKBN22O33E.

been the case as a result of Z Law's refusal to share with Chegg the very same electronic materials it had shared with the AAA. Moreover, this *ex parte* communication with the AAA violated the AAA Consumer Arbitration Rules ("AAA Rules"). *See* Meal Decl., Ex. 1, R-52(c) ("Unless directed differently by the AAA or by the arbitrator, any documents and all written communications submitted by any party to the AAA or to the arbitrator also shall be sent at the same time to all parties to the arbitration.").

The costs to review the demands, while significant, paled in comparison to the costs Lyles's counsel sought to impose on Chegg to actually arbitrate the demands. Under the AAA Rules' fees structure, arbitration fees are generally assessed on a per-case, rather than per-individual claimant, basis. *See* Meal Decl., Ex. 1, Costs of Arbitration Section. The following fees[3] are assessed for each case filed by a consumer: a Consumer Filing Fee of $200, a Business Filing Fee of at least $300, a Case Management Fee of at least $1,400, and an Arbitrator Compensation Fee of at least $1,500. *Id.* Thus, the AAA fees total for just one case is at least $3,400 – and the AAA fees total for 15,107 cases is a minimum of more than $51 million.[4] Meal Decl., Ex. 1; ¶ 3.

In recognition of this enormous fee exposure, the AAA suggested that Z Law and the initial claimants work together to reduce the potential cost of arbitrations that Z Law had demanded on behalf of the initial claimants. *See* Meal Decl., ¶ 7. Chegg accordingly proposed that Z Law and the initial claimants withdraw the demands purportedly filed with the AAA and instead file a single demand naming all the initial claimants as co-claimants and Chegg as the

---

[3] These are the fees for a desk/documents-only arbitration. *See id.* The fees for an in-person or telephonic arbitration are even higher, as are the fees for having three, instead of one, arbitrators. *See id.*

[4] When combined with the later-filed arbitration demands, the total cost is almost $55 million.

respondent.  *See* Meal Decl., Ex. 5.  As Chegg explained, this approach would result in only one Business Filing Fee, only one Case Management Fee, and only one Arbitrator Compensation Fee being due under the AAA Rules if the arbitrations were to go forward.  *See id.*  In addition to reducing the AAA fee exposure the initial claimants otherwise would have, this approach would in no way prejudice the initial claimants' ability to pursue their purported claims against Chegg. *See id.*  Accordingly, there did not appear to be any good faith basis upon which Z Law and the initial claimants could refuse to proceed in this manner.  *See id.*

And yet, Z Law and the initial claimants *did* refuse to proceed in this manner.  *See* Meal Decl., Ex. 6.  To defend its and the initial claimants' failure in the first instance, and ongoing refusal to assert their purported claims against Chegg by means of a single demand, Z Law relied on the following provision in the Terms of Use:

> You acknowledge and agree that you and Chegg are each waiving the right to a trial by jury or to participate as a Plaintiff or class member in any purported class action or representative proceeding.  Further, unless both you and Chegg otherwise agree, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of any class or representative proceeding.

*Id.* (emphasis removed).  Z Law claimed that this provision "requires the parties to arbitrate individually."  *Id.*

However, as Chegg explained, Z Law and the initial claimants' reliance on this particular provision to justify their initial failure and ongoing refusal to proceed by means of a single arbitration demand actually served to demonstrate, rather than refute, their lack of a good faith basis for such failure and such refusal.  *See* Meal Decl., Ex. 7.  As to the first sentence of that provision, a multi-claimant arbitration demand in which each claimant presents its and only its claims would be neither a "class action" nor a "representative proceeding," so that sentence was irrelevant to the issue at hand.  *Id.*  As to the second sentence of that provision, by its terms that

clause applies only to "the arbitrator" and thus cannot be read to prevent the initial claimants

from consolidating their claims by means of a single demand, even assuming that presenting

those claims by means of a multi-claimant arbitration demand would represent a "consolidation"

of those claims (which it would not).[5] *Id.* Finally, even if this provision could be read to have

prevented Z Law and the initial claimants from in the first instance presenting their claims by

means of filing a single arbitration demand (which it does not), this provision expressly allows Z

Law and the initial claimants to proceed in that fashion with Chegg's agreement (which they

now had). *Id.* Chegg accordingly reiterated its suggestion that the initial claimants present their

purported claims against Chegg by means of a single demand. *Id.*

Instead of agreeing to Chegg's proposal or even justifying its refusal, Z Law responded

that it had "already stated [its] position on the Demands," and it then "suspend[ed] any further

written communications" with Chegg's counsel, purportedly due to the "use of the terms 'no

good faith[,]' 'bad faith' and inserting reservation of rights" in emails. Meal Decl., Ex. 8.

Z Law's campaign to maximize the costs of arbitration did not end with its refusal to

proceed by means of a single demand. Under California law, certain arbitration fees must be

waived for indigent consumers – defined as individuals whose gross monthly income is less than

300 percent of the federal poverty guidelines. Cal. Code Civ. P. § 1284.3(b)(1).[6] Given that

---

[5] The terms of use on Z Law's own website, by contrast, state: "CLAIMS OF MORE THAN ONE SITE VISITOR OR CLIENT CANNOT BE LITIGATED JOINTLY OR CONSOLIDATED WITH THOSE OF ANY OTHER SITE VISITOR OR CLIENT." *TERMS OF USE*, SUETHEM.COM https://suethem.com/Home/TermsOfUse (last visited Jul. 29, 2020). This language, unlike Chegg's, might prevent the filing of a single demand on behalf of multiple claimants if applied to arbitration.

[6] The 2020 annual poverty guideline for a single-person household is $12,760. *U.S. Federal Poverty Guidelines to Determine Financial Eligibility for Certain Federal Programs*, U.S. Dep't of Health and Human Servs., ASPE, https://aspe.hhs.gov/poverty-guidelines (Jan. 8, 2020). Thus, an indigent consumer is defined as an individual whose gross monthly income is less than $3,190. *Id.*

many Chegg users are students and thus likely eligible for a fee waiver, Chegg asked Z Law

what, if anything, it had done to ascertain which of the initial claimants would be eligible for

such a waiver.  Meal Decl., Ex. 7.  If the initial claimants were eligible for a fee waiver, such that

they had no responsibility for paying the fees, then Chegg could have no responsibility for

paying the initial claimants' fees either.  *See* Meal Decl., Ex. 3, Legal Disputes – General

Section.  Z Law refused to respond to this inquiry, Meal Decl., Ex. 8, and Chegg is not aware of

any of the initial claimants having requested a fee waiver pursuant to the provision referenced

above, Meal Decl., ¶ 29.

### D. The Boxes Were Missing Demands

After it had processed each document in the six boxes that Chegg received, Chegg's

vendor found that the boxes contained 15,079 demands – not the 15,107 that Z Law purportedly

filed.  Tehada Decl., ¶ 3.  Moreover, one of demands was missing the first page, making it

impossible to determine the claimant.  *Id*.  Because Z Law continues to refuse to share with

Chegg either the electronic versions of the claims or its spreadsheet of claimants that it shared

with the AAA, Chegg has no way of knowing who the remaining 29 claimants are.  Meal Decl.,

¶ 6.

### E. Many of the Demands in the Boxes Were Improperly Filed

When Chegg was able to analyze the initial demands contained in the boxes it received, it

found that many of those demands were improperly filed.

### 1. Many Initial Claimants Never Agreed to the Terms of Use

The Terms of Use provide that a user agrees to the then-current terms of use by using

Chegg services after Chegg has posted the updated terms of use.  Meal Decl., Ex. 3, Changes

Section.  The Terms of Use, which Z Law claimed had been agreed to by each and every initial

claimant, were posted on February 19, 2019.  *See* Meal Decl., Exs. 2-3.  According to Chegg's

records, however, many of the initial claimants never agreed to the Terms of Use.  Tasgaonkar

Decl., ¶ 3.[7]  Thus, in actuality, many of the initial claimants had never agreed to the agreement

that their counsel presented to the AAA as the basis for AAA jurisdiction over their claims.

>  **2.      Some Initial Claimants Were Not Chegg Users, While Others Were Not Chegg Users Prior to the Event**

Chegg further determined that, for 147 of the demands contained in the six boxes, the

email address the demand asserted to be associated with the claimant's Chegg account was not in

fact associated with any account.  Tasgaonkar Decl., ¶ 7.  And as to 36 of the demands contained

in the six boxes, the Chegg account associated with the email address identified in the demand

was created *after* April 29, 2018, Tasgaonkar Decl., ¶ 4, *i.e.*, after the occurrence of the Event,

Compl. ¶¶ 11-18, such that the claimant could not possibly have suffered any impact from the

Event.

>  **F.      All of the Demands in the Boxes Were Identical to One Another and Claimed Exactly $25,000 in Damages to Defeat Small-Claims-Court Jurisdiction**

When Chegg was able to analyze the demands contained in the boxes it received, it found

that, contrary to Z Law's representations to the press at the time of filing the initial demands,[8]

each demand that Chegg received is identical except for the claimant's name and contact

information and the reference code.  Tehada Decl., ¶ 4.  Each demand states that the claimant's

"personal information was accessed in the data breach and later disclosed and made available for

sale on the dark web."  Meal Decl., Ex. 4.  Each demand states that the breach "has exposed

Claimant to an increased risk of fraud and identity theft."  *Id.*  Each demand states that the

claimant seeks to recover the same "damages under California law for the value of the personal

---

[7] The last log-in date indicates the last date upon which each user accepted the then-current terms of use.

[8] Frankel, *supra* n.2 ("Every demand he filed at AAA, he said, contains unique allegations, so Chegg cannot claim he simply asserted cookie-cutter claims.").

information, time associated with the data breach, the lifetime cost of credit monitoring along with punitive damages." *Id.* And each demand states that the same amount of money is in dispute: $25,000, along with attorney fees and arbitration costs. *Id.*

The $25,000 damages claim made by each demand is significant because it operated to defeat small-claims-court jurisdiction over the claims made in that demand. Under the Terms of Use, once an arbitration is commenced under the arbitration provision, either party has the right to litigate the claims in question in small claims court if they fall within small-claims-court jurisdiction. Meal Decl., Ex. 3, Legal Disputes – General Section. This provision makes sense, as it prevents one party from forcing arbitration on another party where the amount at issue is too small for the claim to be worth arbitrating given the arbitration fees that would be involved. Under California law, small-claims-court jurisdiction is limited to claims for less than $10,000. Cal. Code Civ. P. § 116.221. Thus, by each including a $25,000 damages claim, each of the demands ensured that the claims asserted therein could not be litigated in small claims court pursuant to the arbitration provision's small-claims-court option.

### G.    The $25,000 Damages Claim Lacked a Factual Foundation

The demands contained in the six boxes do not explain how damages for "the value of the personal information, time associated with the data breach, the lifetime cost of credit monitoring along with punitive damages" would amount to anything close to $25,000. Nor do they explain why the compromise of the limited set of personal information involved in the Event, namely, claimants' names, email addresses, shipping addresses, user names, and/or hashed passwords, would create a need for them to monitor their credit at all, much less a need to monitor it for the rest of their lives – which could be up to 80 years or more, given many are students. And it is impossible that the value each of the more than 15,000 initial claimants' personal information, time associated with the Event, and the lifetime cost of credit monitoring would amount to *the*

-12-

*exact same number*.  For example, the amount of time the claimant would spend associated with the Event (if any), the value of the claimant's time, and the claimant's life expectancy (which will determine the length of time for which his or her "lifetime" credit monitoring would extend) are all unique to each claimant.  On their face, then, the demands contained in the six boxes lack any factual foundation insofar as they claim damages of $25,000.

This point is confirmed by the "inquiry" the initial claimants' law firm, Z Law, did of the initial claimants prior to filing the initial demands with the AAA on their behalf.  Z Law operates a website at the domain SueThem.com.[9]  At SueThem.com, Z Law invites consumers to "Join Thousands Of Consumers In Cases Already Filed In Less Than Two Minutes."  *Id*.  Prospective claimants or plaintiffs need only take three steps to submit a claim[10]: (1) "CLICK on the company you want to sue"; (2) "FILL in your information and answer a couple of questions to qualify"; and (3) "SIGN the agreement and we will SUETHEM for you."  *Id*.

Z Law's "Less than Two Minutes" promise is not an exaggeration.  The questions to "qualify" for action against Chegg consisted of only contact information and a "yes" or "no" check box for the statement "I created a Chegg account prior to September 19, 2018."[11] Gelsomini Decl., Ex. 1.  As noted above, the claimants' contact information is the *only* information (other than the reference code) that differentiates one demand from another.  It thus appears that no investigation was ever conducted by Z Law to determine as to each claimant

---

[9] SUETHEM.COM https://www.suethem.com/ (last visited Jul. 29, 2020).

[10] Indeed, the SueThem.com Terms of Use state, "I understand that when I submit a claim through SueThem I am starting a legal process against the Counterparty to enforce my legal rights against the Counterparty."  *TERMS OF USE*, SUETHEM.COM https://suethem.com/Home/TermsOfUse (last visited Jul. 29, 2020).

[11] The Chegg questionnaire is substantially similar to the questionnaires for other target companies currently posted on SueThem.com.  *Compare* Gelsomini Decl., Ex. 1 *with Zynga Lawsuit Questionnaire*, SUETHEM.COM https://www.suethem.com/Company?companyId=12 (last visited Jul. 29, 2020).

whether he or she had in fact suffered the damages he or she claimed in his or her demand, or for that matter whether the claimant had even agreed to the Terms of Use, which as discussed in Part II.E.1, *supra*, many of them had not.

### H.    The $25,000 Damages Claim Also Lacked a Legal Foundation

Even if there were a factual basis to support the $25,000 damages claims made in the demands contained in the six boxes, those damage claims have no legal basis.

### 1.    The $25,000 Damages Claims Are Contradicted by Case Law

There is no legal support for these demands' assertion that Chegg owes each claimant for all the categories of damages claimed – and certainly not for the contention that Chegg owes each claimant *$25,000*.  Rather, the case law overwhelmingly rejects those damages claims.  An individual claimant could only hope to recover even a meaningful fraction of $25,000 if he or she could legally receive a "lifetime of credit monitoring."  But even leaving aside that *future* injuries (e.g., future credit monitoring and future lost time) are not compensable at all, *Adkins v. Facebook*, 424 F. Supp. 3d 686, 695-96 (N.D. Cal. 2019), those few cases that have allowed for credit monitoring in data breach matters by analogy to medical monitoring cases have strictly limited it to situations where credit monitoring was necessary and effective to address the exposure of the plaintiff's personal information, as in situations where the Plaintiff has already experienced identity theft.  *See In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 970 (S.D. Cal. 2014), *order corrected*, No. 11MD2258 AJB (MDD), 2014 WL 12603117 (S.D. Cal. Feb. 10, 2014).  No court has ever recognized credit monitoring as a remedy for the compromise of a mere name, email address, shipping address, user name, and/or hashed password, and no court has recognized a *lifetime* of credit monitoring as a remedy for *anyone*.  The initial claimants' contention that Chegg should pay for them to monitor their credit nearly a century into the future, merely because these pieces of information were

compromised in 2018, is legally baseless.

### 2.    The Limitation of Liability Provision Prohibits Recovery Beyond $250

The Terms of Use's limitation of liability provision limits damages to the amounts paid to Chegg in the past six months or $250, whichever is greater. *See* Meal Decl., Ex. 3, Limitations of Liability; Waiver Section. None of the claimants who made the demands contained in the six boxes paid Chegg anything remotely close to $25,000 in the past six months. *See* Tasgaonkar Decl., ¶ 6. Indeed, only 31 of those claimants paid Chegg more than $250 during this period – with the highest amount being $692. *See* Tasgaonkar Decl., ¶¶ 5, 6. Each such claimant's assertion of a $25,000 damages claim is therefore legally baseless for this reason as well.

### 3.    All Damages Sought Are Barred by the Consequential Damages Disclaimer

The Terms of Use govern users' "use of the Services," which are defined to include Chegg.com and all other web sites, mobile apps, applications and other interactive features or services that posted a link to the Terms of Use. *See* Meal Decl., Ex. 3. With respect to data security, the Terms of Use disclaim any warranties, whether express or implied, (1) with respect to (1) "SECURITY ASSOCIATED WITH THE TRANSMISSION OF INFORMATION TO CHEGG OR VIA THE SERVICES," or (2) "THAT THE SERVICES OR THE SERVER, NETWORK OR OTHER SOFTWARE AND EQUIPMENT THAT MAKES THEM AVAILABLE ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS." *Id.*, Disclaimer of Warranties Section. Thus, to the extent the Terms of Use govern Chegg's relationship with the initial claimants, this provision limits Chegg's liability to the initial claimants.

The Terms of Use also provide that, to the extent permitted by law, "IN NO EVENT SHALL THE CHEGG PARTIES BE LIABLE FOR ANY . . . CONSEQUENTIAL LOSSES OR

DAMAGES RELATED TO:" (1) "THE SERVICES," (2) user's "USE OF . . . THE SITE," or (3) "ANY DAMAGE THAT RESULTS FROM EVENTS BEYOND OUR REASONABLE CONTROL, SUCH AS . . . DAMAGE FROM ANY SECURITY BREACH . . ."  *Id.*, Limitations of Liability; Waiver Section.  Consequential damages are "losses that do not flow directly and immediately from an injurious act but that result indirectly from the act[.]" *Advanced Thermal Sciences Corp. v. Applied Materials, Inc.*, No. SACV 07–1384 JVS (JWJx), 2010 WL 2015236, at *54 (C.D. Cal. May 18, 2010) (quoting Black's Law Dictionary (9th ed. 2009)).  All damages sought by the demands contained in the six boxes are consequential damages barred by the Terms of Use because they do not inevitably arise from any breach of duty but instead depend on a number of intervening events, including a criminal cyberattack.[12] For this reason too, then, there is no world in which the claimants in question would each be legally entitled to $25,000 in damages they seek – even if they had a factual basis for claiming such damages (which they do not).

I.    **The AAA Charges Chegg $7,553,500 in Filing Fees for the Initial Demands**

On June 8, 2020, the AAA sent a letter to both Chegg and Z Law, asserting that under its interpretation of the Terms of Use, Chegg was responsible for payment of the Consumer Filing Fees associated with the initial demands.  Meal Decl., Ex. 9.  In its June 8 letter, the AAA offered no basis for its interpretation of the Terms of Use[13] or for its claimed authority to render

---

[12] The demands also claim "punitive" damages, but even assuming those were available in a case like this (which they are not), they would be constitutionally limited to a modest multiplier of actual damages, and thus would not assist a given claimant in recovering $25,000.  *See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003); *Simon v. San Paolo U.S. Holding Co.*, 35 Cal. 4th 1159, 1188 (2005).

[13] That interpretation was wrong.  Under the Terms of Use, Chegg is obliged to pay the Consumer Filing Fee associated with an arbitration demand only if and only when the arbitrator concludes that the demand was neither frivolous nor made for an improper purpose. Meal Decl., Ex. 3, Fees Section.

a binding interpretation on this legal issue.  *Id.*  Moreover, as of June 8, Chegg had only just begun its review of the contents of the six boxes, so the AAA was unaware at that time that many of the demands contained in those boxes had been improperly filed as discussed in Part II.E *supra*.  *See* Meal Decl., Exs. 10, 11.  In its June 8 letter, the AAA offered no explanation for its decision to rush to judgment on the issues addressed in the letter, without having given Chegg a reasonable amount of time to review and comment on the contents of the six boxes.  Meal Decl., Ex. 9.  Instead, the AAA summarily stated, without further explanation (and, as it turned out, entirely incorrectly), that the initial claimants had "met [the AAA's] administrative filing requirements on each of the 15,107 cases filed."  *Id.*  Based on that incorrect determination, the AAA concluded that Chegg was liable to the AAA for a Consumer Filing Fee of $200 and a Business Filing Fee of $300 as to each of the initial demands, for a total of $7,553,500 in AAA filing fees by reason of those demands.  Meal Decl., Exs. 1, 9.

> **J.      Chegg Notifies the Initial Claimants of Their Material Breaches and Exercises Its Legal Rights by Reason of Such Material Breaches**

On June 26, 2020, Chegg informed the AAA and the initial claimants, through Z Law as their counsel, that based on its review of the contents of the six boxes Chegg had determined that to the extent any of the initial claimants had in fact filed with the AAA one of the arbitration demands contained in the six boxes or a substantially similar demand, and had entered into an agreement with Chegg that might have imposed an arbitration obligation on Chegg in connection with that demand, the initial claimant had materially breached the agreement in so doing because his or her demand was frivolous and/or filed for an improper purpose.  Meal Decl., Exs. 10, 11.  Chegg further notified each initial claimant, through Z Law as his or her purported counsel, that because of his or her material breaches, Chegg was electing to cease all future performance under the agreement from and after the filing of the initial claimant's demand, including

performance under the agreement's arbitration provision and/or under the arbitration provision's delegation clause to the extent either or both was severable from the agreement.  Meal Decl., Ex. 10.  At that time Chegg further notified each initial claimant, through Z Law as his or her purported counsel, that Chegg was also electing to exercise its right to terminate the agreement.  *Id.*[14]

### K.    Z Law Purportedly Files 1,007 More Separate Demands for Arbitration Based on the Event, Including One of Behalf of Lyles

On July 1, 2020, Z Law purportedly filed 1,007 additional demands for arbitration ("subsequent demands") with the AAA based on the Event, on behalf of 1,007 individuals ("subsequent claimants") that Z Law purports to represent.  *See* Meal Decl., Ex. 13.  Lyles, the Plaintiff in this lawsuit, is among the subsequent claimants.  Meal Decl., Ex. 17.

### L.    The Subsequent Claimants (Including Lyles), Together with the AAA, Carry Out the Exact Same Playbook with Regard to the Subsequent Demands as They Did Regarding the Initial Demands

The above-described sequence of events that followed the filing of the initial demands repeated itself, more or less exactly, as to the subsequent demands.  Specifically:

- As it did for the initial demands (*see* Part II.B *supra*), Z Law asserted that each subsequent claimant had agreed to the Terms of Use and that Chegg was obliged to pay the Consumer Filing Fee associated with each subsequent demand.  Meal Decl., Ex. 13.

- As it did for the initial demands (*see* Part II.C *supra*), Z Law again failed to provide electronic copies of the subsequent demands or the spreadsheet identifying the subsequent claimants.  Meal Decl. ¶ 24.  Chegg thus was again forced to engage a vendor to scan each demand and extract the information from each demand.  Meal Decl. ¶ 25.

- As was the case with the initial demands (*see* Part II.C *supra*), the AAA filing,

---

[14] After Chegg closed the initial claimants' accounts, an initial claimant contacted Chegg's Customer Service department and stated he or she was unaware that an arbitration demand had been filed against Chegg in his or her name.  *See* Murff Decl., Ex. 1 ("I have not filed a lawsuit against you . . . I guess I'll have to contact whoever this lawyer is and find out why my name is on this list.").

administration, and arbitrator fees associated with the subsequent demands would have been at least $3,400 per case, resulting in the total AAA fees for the 1,007 subsequent demands being a minimum of more than $3.4 million.  Meal Decl. ¶ 19; Ex. 1, Costs of Arbitration Section.  Thus, as it had done for the initial demands (*see* Part II.C *supra*), Chegg suggested as to the subsequent claimants that they withdraw their individual demands and refile a single demand naming all the subsequent claimants as co-claimants and Chegg as the respondent.  Meal Decl., Ex. 15.  Chegg also reiterated its request that Z Law share what, if anything, it had done to determine which of the subsequent claimants were eligible for a fee waiver.  *Id.*  In response, Z Law stated with no explanation: "We decline your suggestion."  Meal Decl., Ex. 16.

- As was the case with the initial demands (*see* Part II.E *supra*), many of the subsequent demands were improperly filed  – in the case of the 1,007 subsequent demands, many were filed by persons who never agreed to the Terms of Use, ten were filed by persons who never were Chegg users, and four were filed by persons who became Chegg users after the Event.  Tasgaonkar Decl., ¶¶ 8, 10-12.

- As was the case with the initial demands (*see* Part II.F *supra*), the subsequent demands were identical to one another and to the initial demands Chegg received, including that each demanded exactly $25,000 in damages.  Tehada Decl., ¶ 7.

- As was the case with the initial demands (*see* Parts II.G and II.H *supra*), the subsequent demands all lacked either a factual or a legal basis for their $25,000 damages claims, for many of the same reasons as discussed in Parts II.G and II.H *supra* in regard to the initial demands received by Chegg.  Tasgaonkar Decl., ¶¶ 10-12.

- As was the case with the initial demands (*see* Part II.I *supra*), the AAA purported to charge Chegg for the Consumer Filing Fees and the Business Filing Fees associated with the subsequent demands (which aggregated $503,500 in the case of the subsequent demands), and the AAA did so without offering any basis for its interpretation of the Terms of Use on this point or for its claimed authority to render a binding interpretation on this legal issue, and without offering any explanation for its decision to rush to an incorrect judgment on the issues addressed in the letter without having given Chegg a reasonable amount of time review and comment on the subsequent claims. Meal Decl., Ex. 14.

**M.**   **Chegg Notifies the Subsequent Claimants (Including Lyles) of Their Material Breaches and Exercises Its Legal  Rights by Reason of Such Material Breaches**

On August 4, 2020, Chegg sent letters to the AAA and to the subsequent claimants including Lyles, through their counsel Z Law, with respect to the subsequent demands that were substantially identical to the letters it sent on June 26, 2020 with respect to the initial demands,

as discussed in Part II.J *supra*.  Meal Decl., Exs. 18-19.  Specifically, by the August 4 letters

Chegg notified the subsequent claimants, including Lyles, that (i) to the extent any of the

subsequent claimants had in fact filed with the AAA an arbitration demand substantially similar

to one of the subsequent demands received by Chegg, and had entered into an agreement with

Chegg that might have imposed an arbitration obligation on Chegg in connection with that

demand, the subsequent claimant had materially breached the agreement in so doing because his

or her demand was frivolous and/or filed for an improper purpose; (ii) because of his or her

material breaches, Chegg was electing to cease all future performance under the agreement from

and after the filing of the subsequent claimant's demand, including performance under the

agreement's arbitration provision and/or under the arbitration provision's delegation clause to the

extent either or both was severable from the agreement; and (iii) Chegg was also electing to

exercise its right to terminate the agreement.  Meal Decl. Ex. 18.

## III.   ARGUMENT

### A.   Clarification of the Court's Order, Confirming That Chegg Need Not Proceed to Arbitration Now That the Arbitration Provision Is Unenforceable, Is Appropriate

The Order was premised on the existence of an enforceable agreement to arbitrate.  After

the Order was issued, however, Lyles materially breached his agreement[15] with Chegg by filing a

frivolous arbitration demand for the purpose of imposing onerous and unnecessary costs on

Chegg.  Lyles's material breach relieved Chegg of all obligations under the Lyles-Chegg

---

[15] Although the Order was premised on the Chegg terms of use last updated July 31, 2014, Order at 4, Lyles's arbitration demand, like all the claimants' arbitration demands, is purportedly based on the Terms of Use, *see* Meal Decl., Exs. 3, 17.  The analysis herein is the same under either agreement.  Accordingly, when used herein in reference to Lyles, the term "Terms of Use" means both the Terms of Use and the Chegg terms of use last updated July 31, 2014.

agreement, including any obligation to arbitrate.[16]  As Chegg understands the Order, it was not intended to operate in a situation where the very agreement upon which the Order was predicated is no longer enforceable.  However, for the removal of doubt, Chegg seeks clarification of the Order to so state.

### a. Lyles Breached the Terms of Use's Implied Covenant of Good Faith and Fair Dealing

"[E]very contract in California contains an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive the benefits of the agreement."  *Ladd v. Warner Bros. Entm't, Inc.*, 184 Cal. App. 4th 1298, 1306 (Cal. Ct. App. 2010).  The implied covenant extends to the enforcement, as well as the performance, of contractual obligations.  *See* Restatement (Second) of Contracts, § 205.[17]  It may be violated by "objectively unreasonable conduct, regardless of the actor's motive."  *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 796 (1st Dist. 1998).

It is hornbook law that the assertion of a claim that is frivolous and/or brought for an improper purpose breaches the implied covenant.  As the Restatement explains:

> "The obligation is violated by dishonest conduct such as ***conjuring up a pretended dispute, asserting an interpretation contrary to one's own understanding, or falsification of facts***. It also extends to dealing which is candid but unfair, such as ***taking advantage of the necessitous circumstances of the other party to extort a modification*** of a contract for the sale of goods without legitimate commercial reason."

Restatement (Second) of Contracts, § 205 cmt. e (internal citations omitted) (emphasis added); *see also Cohn v. Taco Bell Corp.*, No. 92 C 5852, 1995 WL 247996, at *8 (N.D. Ill. Apr. 24,

---

[16] As explained below, the doctrines of frustration and impracticability also excuse Chegg's obligations under the agreement.

[17] California has adopted Section 205 of the Restatement.  *See Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683 (1988); *Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 370 (1992).

1995) (applying California law) (assertion of a meritless claim may breach implied covenant); *Ford Motor Co. v. Edgewood Properties, Inc.*, No. CIV.A. 06-1278, 2008 WL 4559770, at \*7 (D.N.J. Oct. 8, 2008) (same); *Atl. Mortg. & Inv. Corp. v. Stephenson*, 86 Conn. App. 126, 143-46 (2004) (same).

"The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." *Cobb v. Ironwood Country Club*, 233 Cal. App. 4th 960, 966 (2015). In these situations, the party may exercise its power only for a "purpose within the reasonable contemplation of the parties at the time of formation." *Best Buy Stores, L.P. v. Manteca Lifestyle Ctr., LLC*, 859 F. Supp. 2d 1138, 1154 (E.D. Cal. 2012); *see also Thrifty Payless, Inc. v. The Americana at Brand, LLC,* 218 Cal. App. 4th 1230, 1244 (2013) (party breached implied covenant by "improperly exercising its discretion in allocating costs").

Moreover, the implied covenant may be breached by preventing or hindering the other party's performance under the contract. *See Guidiville Rancheria of California v. United States,* 704 F. App'x 655, 659 (9th Cir. 2017).

Here, Lyles colluded with more than 16,000 other people to bring frivolous arbitration demands against Chegg for the improper purpose of unnecessarily imposing on Chegg AAA arbitration fees in excess of $54 million – an amount that dwarfs any recovery Lyles and his fellow claimants could ever hope to achieve on their claims. Lyles's improper purpose is demonstrated through his and his fellow claimants' decision to pursue their claims in a manner calculated to make the arbitrations they demanded as costly as possible to Chegg, without such costs being in any way necessary or otherwise bringing any benefit to themselves. Most notably, Lyles joined his fellow claimants in refusing – without explanation – to assert their claims by

-22-

means of a single arbitration demand rather than separate arbitration demands – a simple step that would have caused no prejudice to Lyles and his fellow claimants while reducing the minimum AAA fee exposure created by their claims from a gargantuan $54 million+ down to a measly $3,400.  *See* Parts II.C&L *supra*.  Lyles also joined his fellow claimants in (i) refusing to lift a finger to seek the waiver to which he and they may have been entitled of the AAA Consumer Filing Fee associated with his and their demands (*see* Parts II.C&L *supra*); (ii) failing without any valid excuse to provide Chegg, as expressly required under the AAA Rules, with the very same electronic version of his and their demands, and the very same spreadsheet identifying him and his fellow claimants, that he and they had through their counsel readily shared with the AAA without reservation (*see* Parts II.C&L *supra*); (iii) including in his and their demands a $25,000 damages claim that lacked a shred of factual[18] or legal foundation but nonetheless operated to block small-claims-court jurisdiction over the claims made in his and their demands (*see* Parts II.F,G&L *supra*); and (iv) allowing his and their demands to be filed with the AAA without causing their counsel to take the fundamental step of screening out those of the demands that were improperly filed on their face, which many of them turned out to be (*see* Parts II.E&L *supra*).  These actions can only be understood and explained, both individually and as a group, as evidencing and establishing that Lyles and his fellow claimants' goal was not to arbitrate their claims against Chegg on their merits, but rather to make such arbitration of their claims utterly cost prohibitive from Chegg's perspective.

---

[18] The $25,000 damages claim advanced by each of Lyles and his fellow claimants in his or her demand is especially bereft of factual foundation in the case of Lyles himself, as his complaint in this very action does not allege he suffered any of the categories of damage alleged in his demand, but rather (and to the contrary) effectively concedes that he has suffered no identity theft or fraud as a result of the Event and thus has no need of even one minute, much less a lifetime, of credit monitoring by reason of the Event.  *See* Part II.
A, G-H *supra*.

This objectively unreasonable conduct evidences a lack of good faith.[19] *See Badie*, 67 Cal. App. 4th at 796. Lyles had the power to file an arbitration demand against Chegg but chose to abuse that power by joining with more than 16,000 other people in each filing a frivolous demand for an improper purpose – thereby frustrating Chegg's ability to receive the benefits of the agreement, namely the benefit of a cost-effective dispute resolution mechanism.[20] *See P.E.A. Films, Inc. v. Metro-Goldwyn-Mayer, Inc.,* No. CV1409010BROGJSX, 2016 WL 6818758, at *9 (C.D. Cal. Aug. 10, 2016) (passing unreasonable expenses from a third party onto the plaintiff "without investigating them or ensuring they were reasonable" breached implied covenant); *Syndicate Films Int'l, LLC v. All. Films, Inc.*, No. CV 09-3873 PA (CTX), 2010 WL 11519582, at *5 (C.D. Cal. Feb. 2, 2010) (attempt to "extort compromises and concessions . . . on other agreements in exchange for its payment of monies owed" breached implied covenant).

Finally, Lyles's actions outlined above have prevented or, at an absolute minimum, substantially hindered the fulfillment of Chegg's performance under the agreement by making the arbitration process cost prohibitive for Chegg. Lyles thus breached the implied covenant for this reason as well. *See Guidiville,* 704 F. App'x at 659.

### b.    Lyles's Breaches Were Material

Whether a breach of contract is material depends on "the importance or seriousness

---

[19] Lyles's conduct also demonstrates that he "subjectively lacks belief in the validity of [his] act," but the Court need not reach the issue of Lyles's subjective lack of good faith, as objectively unreasonable conduct is sufficient to establish lack of good faith. *See Carma*, 2 Cal. 4th at 370.

[20] *See, e.g.,* Meal Decl., Ex. 1, Introduction ("Arbitration is usually faster and cheaper than going to court."); Ex. 3, Arbitration Rules, Governing Law, Jurisdiction and Venue Section (incorporating AAA Rules into Terms of Use); *id.*, Legal Disputes Section (goal is to "provide you with a neutral and cost-effective means of resolving the dispute quickly"); H.R.Rep. No. 96, 68th Cong., 1st Sess., 1 (1924) ("agitation against the costliness and delays of litigation" "can be largely eliminated by agreements for arbitration").

thereof and the probability of the injured party getting substantial performance."[21]  Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 877.  Factors relevant to materiality include (1) the extent to which the injured party will obtain the substantial benefit which it could have reasonably anticipated; (2) the willful, negligent, or innocent behavior of the party failing to perform; (3) the greater or lesser hardship on the party failing to perform in terminating the contract; (4) the extent to which the party failing to perform has already partly performed or made preparations for performance; (5) the greater or lesser uncertainty that the party failing to perform will perform the remainder of the contract, and (6) the extent to which the injured party may be adequately compensated in damages for lack of complete performance.  *Sackett v. Spindler*, 248 Cal. App. 2d 220, 229 (1967).  Each factor supports a finding that Lyles's breaches were material here.

First, as explained above, because of Lyles's breach, Chegg will not obtain the benefit of the cost-effective dispute resolution mechanism it could have anticipated.  *See* Part II.C *supra*.  Second, as also explained above, Lyles has acted in bad faith by willfully participating in his and his fellow claimants' collective strategy of filing mass copycat frivolous arbitration demands in order to impose enormous and wholly unnecessary arbitration costs on Chegg.  Third, Lyles suffers no hardship by Chegg being relieved of its obligations, as Lyles sought to proceed in court in the first instance and can do so now.  Fourth, Lyles has not performed under the arbitration agreement, as his only purported actions under the arbitration agreement materially breached that agreement.  Fifth, for the same reason, there is no reason to believe that Lyles will shift course and properly perform under the agreement.  Finally, Chegg cannot adequately be

---

[21] A violation of the implied covenant of good faith and fair dealing may properly be considered a material breach.  *See* Restatement (Second) of Contracts § 237 (1981); *see also id.* Illustrations 4, 7.

-25-

compensated in damages because there is no guarantee that the arbitrator would order Lyles and his fellow claimants to reimburse Chegg for the AAA fees that they wrongfully imposed on Chegg by means of their demands,[22] and in any event such an order would as a practical matter do nothing for Chegg as it would leave Chegg with the economically unviable task of trying to enforce the award by bringing 16,000+ separate collection actions all around the country, each seeking to enforce and collect $3,400 arbitration award against and from an individual who may well not have sufficient funds to pay the award.

"A material breach of one aspect of a contract generally constitutes a material breach of the whole contract." *Brown v. Grimes*, 192 Cal. App. 4th 265, 278 (2011) (citation omitted). Accordingly, Lyles's breach of the implied covenant is a material breach of the entire Terms of Use – including the arbitration provision contained in Terms of Use and, to the extent severable, that provision's delegation clause.

> **c.    Because of Lyles's Material Breaches, Chegg Was Relieved of Any Further Obligations Under the Terms of Use, Including Its Arbitration Provision**

When a party materially breaches the contract, "the other party may be discharged from its duty to perform under the contract." *Id.* at 277; Restatement (Second) of Contracts § 237 (1981). This fundamental contractual principle applies equally to arbitration agreements. *See, e.g., Eliasieh v. Legally Mine*, 2020 WL 1929244, at *3 (N.D. Cal. April 21, 2020).

---

[22] Under the Terms of Use, any AAA filing, administrative, and arbitrator fees that Chegg pays in the first instance can be recovered by Chegg from the claimant in question only if the arbitrator finds that either the substance of the claim or the relief sought was frivolous or was brought for an improper purpose.  Meal Decl., Ex. 3, Fees Section.  While for the reasons discussed above the evidence overwhelmingly establishes that the claims of Lyles and his fellow claimants are all both frivolous and brought for an improper purpose, there are no guarantees in arbitration and therefore Chegg has no guarantee that the arbitrator would render the correct ruling on this point.

Indeed, both the Federal Arbitration Act ("FAA")[23] and the California Arbitration Act ("CAA") provide that an arbitration agreement is unenforceable when it is revocable under traditional contract law defenses. *See* 9 U.S.C. § 2; Cal. Code Civ. P. § 1281.2(b); *see also Eliasieh*, 2020 WL 1929244, at *3 ("It is well-settled that an arbitration agreement can be avoided by a defense that would be available to a party seeking to avoid the enforcement of any contract."). Because material breach is a traditional contract law defense, "[m]aterial breach is a defense to the enforcement of an arbitration agreement under 9 U.S.C. § 2." *Brunner v. Lyft, Inc.*, No. 19-CV-04808-VC, 2019 WL 6001945, at *2 (N.D. Cal. Nov. 14, 2019).

Following Lyles's material breaches, Chegg properly exercised its right to cease all performance that otherwise might have been due under the Terms of Use from and after the date the breach. *See* Parts II.J&M *supra*. As of the date of Lyles's demand being filed with the AAA, then, the Terms of Use ceased to be enforceable by Lyles against Chegg. Chegg thus was relieved, effective as of the date of the filing of Lyles's demand with the AAA, of any contractual obligation Chegg otherwise might have had to arbitrate Lyles's claims or to take any other action that might be called for under the Terms of Use's arbitration provision, such as paying or advancing any AAA fees that might be due by reason of Lyles's demand.

### d.    The Delegation Clause Is No Longer Enforceable Against Chegg by Lyles for the Same Reasons

Like an arbitration agreement, a delegation clause is unenforceable when it is "revocable under state contract defenses." *Tiri v. Lucky Chances, Inc.*, 226 Cal. App. 4th 231, 242 (2014). The delegation clause may be unenforceable for the same reason the arbitration agreement is

---

[23] The Terms of Use incorporate the FAA and provide that the FAA will govern enforcement and interpretation of the arbitration agreement. Meal Decl., Ex. 3, Arbitration Rules, Governing Law, Jurisdiction and Venue Section. In any event, the FAA and CAA operate similarly in this respect.

unenforceable.  *See id.* at 242 (finding delegation clause was procedurally unconscionable for the same reasons as agreement); *Nielsen Contracting, Inc. v. Applied Underwriters, Inc.*, 22 Cal. App. 5th 1096, 1111 (2018) ("[T]he focus of the court's attention must be on whether the particular challenge *is directed at* the delegation clause, not whether the same challenges are *also* directed at the agreement or agreements into which the delegation clause is embedded or nested."); *Rivera v. Uniqlo Cal.*, LLC, 2017 WL 6539016, at *4 (C.D. Cal. Sept. 8, 2017) ("Because the Delegation Clause is part of the Arbitration Agreement, if the latter is void due to fraud in the inception, the Delegation Clause would also be void.").

Here, Lyles materially breached the Terms of Use.  That breach extended to the Terms of Use's arbitration provision, including, in particular, to that provision's delegation clause.  *See* Part II.A.b *supra*.  Indeed, the delegation clause appears to have been central to the scheme employed here by Lyles and his fellow claimants, as they have attempted to leverage this very clause to force Chegg to pay almost $55 million in AAA arbitration fees just for Chegg to have the opportunity to establish that the Terms of Use are unenforceable and the fees accordingly never came due.  *See* Meal Decl., Ex. 12.  Because of Lyles's material breach of the Terms of Use, including the arbitration provision and its delegation clause, Chegg invoked its right to be relieved of all obligations under the Terms of Use and, to the extent it is severable, the delegation clause.  *See* Meal Decl., Exs. 10, 18.  Thus, for the reasons explained in Part III.A.b above, the delegation clause is, like the Terms of Use itself, no longer enforceable against Chegg by Lyles.

### e.    In any Event, Chegg's Performance is Excused due to Impracticability and Frustration

Although the Court need not reach this issue because of Lyles's material breaches, if for any reason the Court disagrees there was a material breach, Chegg's performance is nevertheless excused because of the doctrines of impracticability and frustration.

"Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." Restatement (Second) of Contracts § 261 (1981); *see also* Cal. Civ. Code § 1598; 1 Witkin, Summary 11th Contracts § 854 (2020). "A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost." *Habitat Tr. for Wildlife, Inc. v. City of Rancho Cucamonga*, 175 Cal. App. 4th 1306, 1336 (2009). Here, Lyles and his fellow claimants created impracticability by banding together through their counsel to file thousands of frivolous arbitration claims for the improper purpose of making the costs of arbitration so absurdly high that it became impracticable for Chegg to perform. The excessive and unreasonably high cost of arbitrations made Chegg's performance impracticable.

Frustration of purpose occurs when "performance remains possible, but the reason the parties entered the agreement has been frustrated by a supervening circumstance that was not anticipated, such that the value of performance by the party standing on the contract is substantially destroyed." *Id.* Here, as explained above, the basic reason for entering into an agreement to arbitrate was to provide a cost-effective dispute resolution mechanism (*see* Part III.A.a *supra*). That purpose was destroyed by Lyles and his fellow claimants' orchestration of the mass aggregation of frivolous arbitration demands brought for an improper purpose.

Accordingly, even if Lyles's actions did not amount to a material breach of the Terms of Use, Chegg would have been excused from any obligation to arbitrate or pay arbitration fees due to impracticability and frustration.

* * * * *

For the reasons set forth above, Lyles's arbitration agreement with Chegg is no longer enforceable against Chegg. Chegg does not believe that the provision in the Order directing "the parties" to "proceed to arbitration" was intended to operate in a scenario where, as here, there is no longer any contractual basis to require arbitration. In an abundance of caution, and out of respect for the Court's process, however, Chegg requests that the Court clarify the Order to say that it has no continuing application now that the arbitration provision in the parties' agreement and the delegation clause contained therein are no longer enforceable.

### B. In the Alternative, Modification of the Order, Relieving Chegg of Any Obligation to Arbitrate, Is Appropriate

Alternatively, if the Court determines that the Order does continue to operate even now that the underlying arbitration provision and its delegation clause are unenforceable, Chegg respectfully requests modification of the Order to relieve Chegg of the portion of the Order directing the parties to proceed to arbitration.

### 1. Legal Standard

A motion for modification may be granted for "any . . . reason that justifies relief." Fed. R. Civ. P. 60(b)(6). This catch-all provision of Rule 60(b) allows courts to modify judgments whenever necessary to accomplish justice, *Liljeberg v. Health Servs. Acquisitions Corp.*, 486 U.S. 847, 863 (1988), as long as the movant shows "timeliness, a meritorious position, lack of prejudice to the opposition, and exceptional circumstances," *In re Under Armour Sec. Litig.*, No. CV RDB-17-0388, 2020 WL 363411, at \*4 (D. Md. Jan. 22, 2020) (internal quotations omitted); *see also Nat'l Credit Union Admin. Bd. v. Gray*, 1 F.3d 262, 266 (4th Cir. 1993) (Rule 60(b)(6) "has been described as a 'grand reservoir of equitable power to do justice in a particular case.'") (quoting 7 Moore's Federal Practice ¶ 60.27[1] at 60–266 (1993). Each element is easily satisfied here.

## 2.    The Motion Is Timely

Chegg brought the Motion immediately after it exercised its right to cease performance of its agreement with Lyles by reason of Lyles's material breaches of that agreement.  Meal Decl., Ex. 18.  Moreover, Chegg exercised that right promptly after it completed its review of the subsequent demands and determined that Lyles was one of the subsequent claimants and had materially breached his agreement with Chegg by filing a frivolous arbitration demand for an improper purpose.  Tasgaonkar Decl., ¶ 9.  Indeed, Chegg's exercise of that right and bringing of the Motion occurred less than a month after Lyles's arbitration demand was filed with the AAA. Meal Decl., Exs. 13, 17.  There can be no dispute about the timeliness of the Motion.  *See Under Armour*, 2020 WL 363411, at *4 n.9.

## 3.    Chegg Has a Meritorious Position

As discussed above, Chegg has a meritorious claim that Lyles's material breaches of the parties' arbitration agreement relieved Chegg of any further obligations under the agreement upon which the Order was based.  *See Gray*, 1 F.3d at 265 (finding "meritorious defense threshold" met where allegation "would provide a good defense to the claim").  Because the foundation of the Court's order to compel arbitration has been destroyed, Chegg has a meritorious claim for relief from the Order to the extent it requires Chegg to proceed to arbitration notwithstanding the fact that the arbitration provision is no longer enforceable.

## 4.    Granting this Motion Would Not Cause Unfair Prejudice

Lyles would suffer no prejudice as a result of the Motion being granted.  Because the arbitration agreement upon which the Order was premised is no longer enforceable, Lyles will now be able to proceed to present his claim in court – Lyles's originally preferred venue.  *Under Armour*, 2020 WL 363411, at *8 ("The prejudice must be something beyond that which befalls any litigant when a favorable Judgment is set aside, and cannot amount to the mere protraction of

-31-

legal proceedings."). "Additional legal costs . . . are the inevitable result whenever a judgment is vacated," and thus is not enough to show prejudice for the purpose of a Rule (60)(b) motion. *Gray*, 1 F.3d at 265.

### 5.      Extraordinary Circumstances Are Present

Relief from the Order is warranted given the extraordinary circumstances present here. In finding extraordinary circumstances, a court may consider "the risk of injustice to the particular parties," "the risk that the denial of relief will produce injustice in other cases," and "the risk of undermining the public's confidence in the judicial process" *Liljeberg*, 486 U.S. at 848; *see also Buck v. Davis*, 137 S. Ct. 759, 778 (2017). All of these factors weigh in favor of Chegg.

As set forth above, Lyles's course of conduct has imposed an extraordinary injustice on Chegg. Lyles and his fellow claimants, through their counsel, colluded to impose prohibitively high and wholly unnecessary arbitration fees on Chegg and they carried out that scheme by filing 16,000+ frivolous arbitration demands for the specific purpose of thereby imposing such prohibitively high fees on Chegg that the very arbitrations they had demanded would be too expensive to defend. The Order, if left unmodified, would further that scheme, and work injustice on Chegg, by forcing Chegg to proceed with arbitration and to incur the costs associated with doing so even though there is no enforceable agreement requiring either the arbitration to be conducted or the costs to be incurred.

Relief is particularly appropriate here because, if left unchecked, the mass arbitration strategy that has been deployed against Chegg threatens to poison the entire arbitration system. A party victimized by that strategy, and thereby faced with the prospect of being forced to pay sky-high arbitration fees in order even to initiate the arbitration process, could be extorted into paying ransom-like settlement amounts to claimants whose claims have zero basis in fact or law.

Notably, Z Law, counsel for Lyles and his fellow claimants, is already trying to deploy this very same strategy with multiple other companies. *See* SUETHEM.COM https://www.suethem.com/ (last visited Jul. 29, 2020). If successful, this strategy would defeat the goals of Congress and the Supreme Court in promoting the arbitration system, *see* Part III.A.a *supra*, and could weaken or even destroy that system.

\* \* \* \* \*

For the reasons set forth above, to the extent the Order still applies notwithstanding the arbitration provision on which it was based no longer being enforceable, relief from the Order is justified here and, further, necessary to accomplish justice. *See Liljeberg*, 486 U.S. at 864; Part III.B.5 *supra*. Thus, the Court should in that event modify the Order under Fed. R. Civ. P. 60(b)(6) so that it relieves Chegg of any obligation to proceed to arbitration.

## IV.    **CONCLUSION**

For the reasons set forth above, Chegg respectfully requests that the Court grant Chegg's motion for clarification or modification of the Order.

Dated:  August 4, 2020

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP


By:   */s/ Jonathan A. Direnfeld*
　　　Jonathan A. Direnfeld (Bar No. 28859)
　　　ORRICK, HERRINGTON &
　　　SUTCLIFFE LLP
　　　1152 15th Street, N.W.
　　　Washington, D.C. 20005
　　　jdirenfeld@orrick.com
　　　Telephone:  (202) 339-8614

　　　Douglas H. Meal (*admitted pro hac vice*)
　　　ORRICK, HERRINGTON &
　　　SUTCLIFFE LLP
　　　222 Berkeley Street, Suite 2000
　　　Boston, MA 02116
　　　dmeal@orrick.com
　　　Telephone:  (617) 880-1880

　　　Michelle Visser (*admitted pro hac vice*)
　　　ORRICK, HERRINGTON &
　　　SUTCLIFFE LLP
　　　405 Howard Street
　　　San Francisco, CA 94105
　　　mvisser@orrick.com
　　　Telephone:  (415) 773-5518

　　　David Cohen (*admitted pro hac vice*)
　　　ORRICK, HERRINGTON &
　　　SUTCLIFFE LLP
　　　51 West 52nd Street
　　　New York, NY 10019
　　　david.cohen@orrick.com

*Attorneys for Defendant Chegg, Inc.*

-34-